# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Beverly Dale Jolly and Brenda Rice Jolly, Respondents,

v.

General Electric Company, et al., Defendants,

Of whom Fisher Controls International LLC and Crosby Valve, LLC are the Appellants.

Appellate Case No. 2017-002611

Appeal From Spartanburg County
Jean Hoefer Toal, Acting Circuit Court Judge

Opinion No. 5858
Heard November 2, 2020 – Filed September 1, 2021

**AFFIRMED**

C. Mitchell Brown, Allen Mattison Bogan, James Bruce Glenn, and Nicholas Andrew Charles, all of Nelson Mullins Riley & Scarborough, LLP, of Columbia, for Appellants.

Theile Branham McVey and John D. Kassel, both of Kassel McVey, of Columbia; and Lisa White Shirley and Jonathan Marshall Holder, both of Dean Omar Branham Shirley, LLP, of Dallas, Texas, all for Respondents.

**GEATHERS, J.:**  In this complex mesothelioma case, Appellants Fisher Controls International LLC (Fisher) and Crosby Valve, LLC (Crosby) seek review of the circuit court's denial of their motions for a directed verdict and a judgment notwithstanding the verdict (JNOV), its granting of a new trial *nisi additur* to Respondents Beverly Dale Jolly (Dale) and Brenda Rice Jolly (Brenda), its partial denial of Appellants' motion for setoff, and its denial of Appellants' motion to quash subpoenas for their corporate representatives.  Among the multitudinous arguments made in their brief, Appellants assert there was no scientifically reliable evidence that Dale's workplace exposure to their products proximately caused his mesothelioma.  We affirm.

## FACTS/PROCEDURAL HISTORY

From early 1980 to late 1984, Dale worked as a mechanical inspector for Duke Power Company (Duke) at the Oconee, McGuire, and Catawba nuclear power plants in South Carolina and North Carolina.[1]  During this time, his duties regularly brought him within close proximity to his co-workers' removal of asbestos gaskets from valves supplied by various manufacturers,[2] including Appellants.  Appellant Fisher Controls International LLC sold customized process control valves to Duke, and Appellant Crosby Valve, LLC sold customized safety valves to Duke.  Flanges connected these valves to pipelines,[3] and each flange housed a gasket for the purpose of providing a tight seal to the connection.  Whenever a worn gasket was replaced, Dale had to verify the number on the replacement gasket by the manufacturer's manual and document this verification.  He also had to verify that the gasket was torqued correctly.

Dale was so close to the process of removing the worn gaskets that he saw and breathed in the dust being released from the brushing and grinding of the gaskets,[4] and he wore safety goggles to keep the dust out of his eyes.  Although

---

[1] The Oconee plant is in Seneca, South Carolina; the McGuire plant is in Huntersville, North Carolina; and the Catawba plant is in York, South Carolina.

[2] A gasket is "a material (such as rubber) or a part (such as an O-ring) used to make a joint fluid-tight."  *Gasket*, Merriam-Webster Dictionary, https://www.meriam-webster.com/dictionary/gasket (last visited August 24, 2021).

[3] A flange is "a rib or rim for strength, for guiding, or for attachment to another object."  *Flange*, Merriam-Webster Dictionary, https://www.meriam-webster.com/dictionary/flange (last visited August 24, 2021).

[4] When an asbestos gasket is new, it is encapsulated, but after normal use of the product, it deteriorates.  Therefore, before a used gasket could be replaced, it had to

Appellants manufactured only the valves and not the gaskets used with these valves, Appellants kept the gaskets in stock and sold them to Duke upon receiving Duke's purchase orders and specifications.

In late 1984, Dale left his position as a mechanical inspector and, except for a two-month break in 2002, continued to work for Duke in other capacities until December 2015, when he was diagnosed with mesothelioma, a type of lung cancer. After his diagnosis, Dale underwent extensive treatment for his condition, including several rounds of chemotherapy, a complicated surgery, a subsequent hospitalization, and experimental immunotherapy.

On April 25, 2016, Dale and his wife, Brenda, filed the present products liability action against Appellants and numerous co-defendants, alleging that Dale was exposed to asbestos emanating from the defendants' products. Respondents asserted causes of action for, inter alia, negligence, strict liability, breach of implied warranty, fraudulent misrepresentation, and loss of consortium. Respondents alleged, inter alia, that (1) Appellants were strictly liable for the harm caused to Dale by their products because the lack of an adequate warning or adequate use instructions rendered the design of these products defective and dangerous; (2) Appellants were negligent in the design of their products and in failing to warn of the harm resulting from the use of their products; and (3) Appellants breached their implied warranties that their products were of good and merchantable quality and fit for their intended use. Prior to trial, Respondents settled their claims against Appellants' co-defendants for a total sum of $2,270,000. In exchange for these proceeds, Respondents released all of their present and future claims against the co-defendants, including any future wrongful death claim.

In July 2017, the circuit court conducted a trial on Respondents' claims against Appellants. At the conclusion of the trial, the jury awarded $200,000 in actual damages to Dale for his negligence and breach of warranty claims and $100,000 in actual damages to Brenda for her loss of consortium claim. The circuit court later granted Respondents' motion for a new trial *nisi additur* and increased Dale's award to $1,580,000 and Brenda's award to $290,000.

The circuit court also granted, in part, Appellants' motion for a setoff of Respondents' pre-trial settlement proceeds against the increased verdicts for Dale and Brenda. The circuit court accepted Respondents' stated allocation of the

---

be removed with grinders and brushes so that the face of the flange it sat against was clean enough to prevent future leaks.

proceeds, which assigned one-third to Dale's claims; one-third to Brenda's claims; and one-third for a future wrongful death claim. As to the portion of proceeds Respondents had allocated to a future wrongful death claim, the circuit court denied setoff. The circuit court also denied Appellants' motion for a JNOV and issued a separate written order memorializing its pre-trial denial of Appellants' motion to quash Respondents' trial subpoenas. Appellants later filed a motion for reconsideration, which the circuit court denied. This appeal followed.

## LAW/ANALYSIS

### I. Directed Verdict/JNOV

Appellants challenge the circuit court's denial of their motion for a JNOV on the following grounds: (1) there was no reliable evidence that Dale's workplace exposure to their products proximately caused his mesothelioma; (2) Respondents failed to meet their burden of proof on their claims that were based on a failure to warn; (3) Respondents failed to meet their burden of proving a design defect for purposes of their negligence and implied warranty claims; and (4) Respondents failed to show Appellants deviated from the standard of care. We will address these grounds in turn.

A motion for a JNOV is "merely a renewal of [a] directed verdict motion." *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 331, 732 S.E.2d 166, 171 (2012). "When ruling on a JNOV motion, the [circuit] court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party." *Williams Carpet Contractors, Inc. v. Skelly*, 400 S.C. 320, 325, 734 S.E.2d 177, 180 (Ct. App. 2012). "This court must follow the same standard." *Id.* "If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt, the case should be submitted to the jury." *Id.* (quoting *Chaney v. Burgess*, 246 S.C. 261, 266, 143 S.E.2d 521, 523 (1965)).

"In considering a JNOV, the [circuit court] is concerned with the existence of evidence, not its weight," and "neither [an appellate] court, nor the [circuit] court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence." *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003) (second alteration in original) (quoting *Reiland v. Southland Equip. Serv., Inc.*, 330 S.C. 617, 634, 500 S.E.2d 145, 154 (Ct. App. 1998), *abrogated on other grounds by Webb v. CSX Transp., Inc.*, 364 S.C. 639, 615 S.E.2d 440 (2005)). "The jury's verdict must be upheld unless no evidence reasonably supports the jury's

findings." *Id.* In other words, a motion for a JNOV "may be granted only if no reasonable jury could have reached the challenged verdict." *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998).

### A. Proximate Cause

Appellants maintain there was no evidence that Dale's exposure to asbestos from their products proximately caused his mesothelioma. Specifically, Appellants argue there was no reliable evidence showing Dale's exposure to their products was a "substantial cause" of his illness. We disagree.

Whether the theory under which a products liability plaintiff seeks recovery is negligence, strict liability, or breach of warranty, it is necessary to show "the product defect was the proximate cause of the injury sustained." *Bray v. Marathon Corp.*, 356 S.C. 111, 116, 588 S.E.2d 93, 95 (2003).[5] "Proximate cause requires proof of both causation in fact and legal cause, which is proved by establishing foreseeability." *Bray*, 356 S.C. at 116–17, 588 S.E.2d at 95. "Ordinarily, the

---

[5] *See also* S.C. Code Ann. § 15-73-10 (2005) ("One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if (a) The seller is engaged in the business of selling such a product, and (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."); S.C. Code Ann. § 15-73-30 (2005) ("Comments to § 402A of the Restatement of Torts, Second, are incorporated herein by reference thereto as the legislative intent of this chapter."); *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 462–63, 494 S.E.2d 835, 842 (Ct. App. 1997) ("A products liability case may be brought under several theories, including strict liability, warranty, and negligence[, and] regardless of the theory on which the plaintiff seeks recovery, he must establish three elements: (1) he was injured by the product; (2) the injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) that the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant." (citation omitted)); *Jackson v. Bermuda Sands, Inc.*, 383 S.C. 11, 15, 677 S.E.2d 612, 614–15 (Ct. App. 2009) ("In addition, liability for negligence also requires proof that the manufacturer breached its duty to exercise reasonable care to adopt a safe design."); *Small*, 329 S.C. at 466, 494 S.E.2d at 844 ("[L]iability may be imposed upon a manufacturer *or* seller notwithstanding subsequent alteration of the product when the alteration could have been anticipated by the manufacturer or seller . . . ." (emphasis added)).

question of proximate cause is one of fact for the jury[,] and the [circuit court's] sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence." *Small*, 329 S.C. at 464, 494 S.E.2d at 843.

Further, "[t]o establish medical causation in a product liability case, a plaintiff must show both general causation and specific causation." *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 814 (D.S.C. 2011) (quoting *In re Bausch & Lomb Inc. Contacts Lens Solution Prods. Liab. Litig.*, 693 F. Supp. 2d 515, 518 (D.S.C. 2010)). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.* (quoting *In re Bausch & Lomb*, 693 F. Supp. 2d at 518); *see also* David E. Bernstein, *Getting to Causation in Toxic Tort Cases*, 74 BROOK. L. REV. 51, 52 (2008). General causation "is generally not an issue in asbestos litigation" due to the parties' acknowledgment that exposure to asbestos causes mesothelioma. *Tort Law — Expert Testimony in Asbestos Litigation — District of South Carolina Holds the Every Exposure Theory Insufficient to Demonstrate Specific Causation Even If Legal Conclusions Are Scientifically Sound. — Haskins v. 3M Co.* (hereinafter *Asbestos Litigation*), 131 HARV. L. REV. 658, 658 n.4 (2017). However, to show specific causation,

> a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies. This would include proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was consistent with that experienced by those in the study.

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997).

Moreover, when there are multiple possible sources of the plaintiff's exposure to a toxin, as in the present case, the plaintiff must also show that his exposure to a particular defendant's product was a "substantial factor" in the development of the plaintiff's disease. *See* Bernstein, 74 BROOK. L. REV. at 52 ("[W]ith regard to cases in which a plaintiff alleges injury after exposure to a toxin from multiple sources, a given defendant may only be held liable if the plaintiff proves by a preponderance

of the evidence that exposure to that defendant's products was a 'substantial factor' in causing that injury.").  South Carolina has adopted the substantial factor test:

> In determining whether exposure is actionable, we adopt the "frequency, regularity, and proximity test" set forth in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162[–63] (4th Cir. 1986):  "To support a reasonable inference of *substantial causation* from circumstantial evidence, there must be evidence of exposure to a *specific product* on a *regular* basis over some *extended* period of time in *proximity* to where the plaintiff actually worked."

*Henderson v. Allied Signal, Inc.*, 373 S.C. 179, 185, 644 S.E.2d 724, 727 (2007) (emphases added); *see also Lohrmann*, 782 F.2d at 1158, 1162 (applying Maryland law to a pipefitter's products liability claims and restating Maryland's substantial factor test:  "To establish proximate causation in Maryland, the plaintiff must introduce evidence [that] allows the jury to reasonably conclude that it is more likely than not that the conduct of the defendant was a *substantial factor* in bringing about the result." (emphasis added)).[6]  While the substantial factor test relaxes the "but-for" requirement of traditional tort cases,[7] it still requires the plaintiff to show "more than a casual or minimum contact with the product." *Lohrmann*, 782 F.2d at 1162.[8]

---

[6] *See also* Bernstein, 74 BROOK. L. REV. at 55 ("Beyond general and specific causation, an additional causation issue arises when multiple defendants are responsible for exposing the plaintiff to a harmful substance.  The most common example is a plaintiff who contracts an asbestos-related disease, such as lung cancer or asbestosis, and was exposed to asbestos from multiple sources.  Assuming the plaintiff is able to show that his disease was more probably than not caused by asbestos exposure, he still has to prove that a particular defendant's asbestos-containing product was a 'proximate cause' of that injury to recover damages from that defendant.").

[7] *See Asbestos Litigation*, 131 HARV. L. REV. at 658–59 (explaining that courts presiding over asbestos litigation have departed from traditional tort standards to overcome evidentiary hurdles inherent in these cases and highlighting the substantial factor test as a departure from requiring the plaintiff to show that he would not have developed mesothelioma but for exposure to the defendant's product).

[8] Use of the "substantial factor test" has become widespread.  *See, e.g., Slaughter v. S. Talc Co.*, 949 F.2d 167, 171 (5th Cir. 1991) ("The most frequently used test for causation in asbestos cases is the 'frequency-regularity-proximity' test announced in [*Lohrmann*].");  *id.* n.3 (listing jurisdictions adopting the *Lohrmann* test).

The evidence in the present case satisfies general causation, specific causation, and the substantial factor test. At trial, Dale testified that during his four years as a mechanical inspector, his duties regularly brought him within close proximity to his co-workers' removal of asbestos gaskets from valves supplied by various manufacturers, including Appellants. Dale recounted that he regularly and consistently worked in the vicinity of other workers removing asbestos gaskets from a "good many" Crosby valves and "[a] lot of" Fisher valves. These asbestos gaskets were used in not only the flanges connecting the valve to a pipe but also internal flanges, i.e., flanges within the valve, and some internal gaskets appeared to be used with other internal components of the valve.

This work occurred at the Oconee, McGuire, and Catawba power stations whenever each respective station would shut down its operations to change out the uranium core and perform system maintenance. Each plant had at least one shutdown per year, and each shutdown would last approximately ten to twelve weeks. Dale was so close to the removal process that he saw and breathed in the dust being released from the brushing and grinding of the gaskets, and he wore safety goggles to keep the dust out of his eyes. Some of the valves were so large that the flange opening was tall enough for a person to fit in, and the removal process was time-consuming. David Taylor, Dale's co-worker, testified that there were hundreds of these valves at the Oconee plant.

Although Appellants manufactured only the valves and not the gaskets used with these valves, Appellants kept the gaskets in stock and sold them to Duke upon receiving Duke's purchase orders and specifications. *See supra* n.5. A major component of many of these gaskets, as well as replacement gaskets supplied by Appellants, was asbestos.

Appellants maintain that they sold to Duke only internal gaskets rather than "flange gaskets," implying that Dale's work around gasket removals was limited to only those flanges connecting the valve to a pipe. However, the evidence shows at least some of Appellants' valves had internal flanges that required a gasket. Therefore, the term "flange gasket" should encompass these internal gaskets that Appellants undoubtedly sold to Duke. Appellants also maintain that Dale's testimony regarding his exposure did not include these internal gaskets. However, Dale testified that his duties included inspecting the work of the valve crews on the valves' internal components and this required being very close to the crews, even standing right beside them on many occasions. He also described the crews taking valves apart and his own verification of the number on the particular replacement

gasket that went into a valve using the valve manufacturer's manual. Further, several of Duke's purchase orders and Fisher's invoices show Fisher's sale of flange gaskets to Duke, and there is no obvious indication of whether these gaskets were for internal flanges or flanges that connect the valve to a pipe.[9]

The evidence summarized above, by itself, meets *Henderson*'s substantial factor test.[10] In a nutshell, Dale testified that during his four years as a mechanical inspector, he regularly and consistently worked in close proximity to co-workers removing asbestos gaskets from a "good many" Crosby valves and "[a] lot of" Fisher valves and that he breathed the dust, which was visible.[11] Additionally, the expert testimony is sufficient to show both general and specific medical causation. Respondents presented the testimony of Dr. Arthur Frank, a physician specializing in occupational medicine;[12] Dr. John Maddox, a pathologist; and Dr. Arnold Brody, a cell biologist. Additionally, the affidavit of Dr. Frank was admitted into evidence.

[9] Several Duke purchase orders submitted to Fisher designate asbestos gaskets with a "flanged fitting."

[10] *See Henderson*, 373 S.C. at 185, 644 S.E.2d at 727 ("In determining whether exposure is actionable, we adopt the 'frequency, regularity, and proximity test' set forth in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162[–63] (4th Cir. 1986): 'To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.'").

[11] In support of their challenge to the sufficiency of Respondents' causation evidence, Appellants cite the Fourth Circuit's opinion in *Lohrmann*, in which the court upheld the district court's ruling that the plaintiff's asbestos exposure on ten to fifteen occasions of between one and eight hours duration was insufficient "to raise a permissible inference that such exposure was a substantial factor in the development of his asbestosis." 782 F.2d at 1163. However, the present case does not concern asbestosis, which, according to Dr. Frank, requires higher exposure levels than the exposure levels that can cause mesothelioma. Therefore, the facts in *Lohrmann* do not lend themselves to a valid comparison with the facts in the present case.

[12] Dr. Frank also has a doctorate in biomedical sciences, and he has been a consultant to the National Institute for Occupational Safety and Health and an advisor to the Occupational Safety and Health Administration ("OSHA"). He has testified in numerous mesothelioma cases nationwide. *See, e.g.*, *Rost v. Ford Motor Co.*, 151 A.3d 1032, 1044 (Pa. 2016). In addition to performing cancer research at the National Cancer Institute, he participated in epidemiologic studies of asbestos-exposed populations.

Critically, Dr. Frank stated in his affidavit that his opinions were his "medical and scientific opinions" and that he was "not offering legal opinions about whether an exposure is 'significant' or 'substantial' within the meaning of the law." Dr. Frank also stated, "Evaluation of all available human data provides no evidence for a threshold or for a 'safe' level of asbestos exposure," and "[t]here is overwhelming, generally accepted evidence that inhalation of asbestos fibers of any type, from any source or product, causes mesothelioma."[13] Dr. Frank noted that the median latency period for malignant pleural mesothelioma, with which Dale was diagnosed, is 44.6 years among males.

Dr. Frank also noted that this particular illness is "an aggressive cancer of the membranes lining the lungs" and cited a study recognizing that all forms of asbestos cause mesothelioma. He also offered his scientific opinion that every "occupational, para-occupational, environmental or domestic exposure contributes to the risk of developing mesothelioma" and the cumulative exposure to asbestos contributes to the total dose of asbestos. Dr. Frank explained at trial that "cumulative exposure" means the likelihood of contracting cancer rises with increasing amounts of exposure. Dr. Frank added, "So[,] if someone has multiple exposures, even to multiple products, all of them have contributed to make up the cumulative dose. And for any given individual, it is that cumulative dose that gave them that disease." In his affidavit, he stated that all of the epidemiological studies he cited use cumulative exposure when discussing risk. He further stated that even in occupational settings,

---

[13] Dr. Frank explained,

> While scientists working for the asbestos industry and defendants in asbestos product liability lawsuits contend that one can extrapolate a "no adverse effect level" from the existing data and/or that massive potency differences [exist] between hypothetical identical fibers of different types of asbestos, those opinions are outside of the scientific mainstream and *have been considered and rejected by independent panels of scientific experts with no bias or agenda*, such as [the International Agency for Research on Cancer, the Agency for Toxic Substances and Disease Registries, and the National Institute for Occupational Safety and Health]."

(emphasis added).

it is usually difficult, if not impossible, to quantify the amount of exposure. Dr. Frank frequently referenced the epidemiological studies on which he based his testimony as well as the statements in his affidavit.

After having reviewed Dale's deposition testimony, his medical records, and other case documents, Dr. Frank testified at trial that the body of literature about the level of asbestos emitted when asbestos flange gaskets are removed from a valve indicates that significant levels of asbestos fibers are released when the gasket is removed using a hand wire brush or an electric-powered grinder. He explained that a significant level of asbestos fibers that can cause disease cannot be seen with the naked eye, and therefore, if one can see dust emanating from an asbestos product, the level is "potentially very high," depending on the percentage of asbestos in the product. Given Dale's testimony that he saw dust emitted from the removal of gaskets, Dr. Frank stated the level of asbestos fibers to which Dale was exposed could have been very high. Dr. Frank quantified this type of exposure by comparing it to the background or ambient (non-workplace) exposure in urban areas, concluding that Dale's exposure to the removal of one gasket for a short period of time would have been in the range of 1 to 99 fibers per cubic centimeter, millions of times higher than background exposure.

Dr. Frank further testified that even the current permissible exposure limit of one-tenth of one fiber per cubic centimeter over the course of a year presents a cancer risk. According to Dr. Frank, some countries allow no exposure, and although rare, a single day of exposure to asbestos has been documented in epidemiological data as causing a person to contract mesothelioma. He also stated that a month or less of exposure has been documented as doubling the risk of lung cancer. Dr. Frank concluded that during Dale's four years working as a mechanical inspector for Duke, his regular and frequent exposures, from a distance of ten feet or less, to the removal of asbestos gaskets from the flange face of valves using wire brushing tools and scrapers contributed to the cumulative exposure that resulted in Dale's mesothelioma. He stated that if Dale's exposures "to either Crosby or Fisher valves had been his only exposure, that . . . would have been sufficient to cause his mesothelioma."

Dr. John Maddox, a pathologist who has diagnosed over 500 patients with mesothelioma, cited studies establishing that even individuals in the lowest exposure category can develop mesothelioma after asbestos exposure. He also cited a study indicating that individuals in high-exposure occupations had shorter latency periods than those in occupations with lower exposures, citing mean latency periods for the high-exposure occupations of insulators and shipyard workers as 29.6 years and 35.4

years, respectively. In comparison, Dale's latency period was 31 years, as he was diagnosed with mesothelioma in 2015, thirty-one years after his last exposure to the asbestos gaskets sold by Appellants in late 1984.

After examining Dale's pathology records, Dr. Maddox determined that Dale had a right pleural malignant mesothelioma, epithelioid type. Dr. Maddox concluded that Dale's mesothelioma was caused by his cumulative asbestos exposure throughout his life. Dr. Maddox was asked to give his opinion on whether Dale's asbestos exposures from 1980 to 1984 caused his mesothelioma based on the following assumptions: (1) over the course of "three to four years," Dale's exposures "came from asbestos-containing gaskets and packing used in some but not all of the valves at a power plant during outages . . . at several plants"; (2) as a regular part of his job, Dale was close enough to see the dust created by the removal of these gaskets, "often working one to two feet from" this process; and (3) the level of each of these exposures was hundreds of thousands of times higher than background levels. Dr. Maddox testified these exposures were significant, repetitive, high enough to provide visible dust, and within a reasonable latency period, which is at least ten years. Dr. Maddox stated that those exposures would be "sufficient to deem that causative." Subsequently, Dr. Maddox was asked to assume that of those exposures, Dale had "multiple exposures . . . from [Appellants'] valves in addition to several other companies' equipment." Based on this assumption, Dr. Maddox testified that the exposures to Appellants' products "would be significant contributors to the diagnosis and development of malignant mesothelioma."

Dr. Arnold Brody, a cell biologist, testified concerning how the inhalation of asbestos causes mesothelioma. Dr. Brody explained that there is a consensus in the scientific community that all of the commercial varieties of asbestos fibers "cause all of the asbestos diseases." He also explained that whether an individual develops a disease from his or her exposure depends on the dose and that individual's personal susceptibility based on the response of his or her genetic defenses, and for mesothelioma, there is no known threshold or level above background levels that is known to be "safe or [that] will not cause mesothelioma."

In sum, the above evidence showed that human inhalation of asbestos fibers of any type can cause mesothelioma, establishing general causation.[14] This evidence also showed that (1) Dale worked in closed proximity to the asbestos released from

_____

[14] *See Fisher*, 817 F. Supp. 2d at 814 ("General causation is whether a substance is capable of causing a particular injury or condition in the general population . . . ." (quoting *In re Bausch & Lomb*, 693 F. Supp. 2d at 518)).

gaskets sold by Appellants; (2) these exposures, each one being at least 1 to 99 fibers per cubic centimeter per gasket (millions of times higher than background exposure), occurred on a regular basis for an extended period of time, 1980 to 1984; (3) even the current permissible exposure limit of one-tenth of one fiber per cubic centimeter over the course of a year presents a cancer risk; (4) Dale's latency period was 31 years; (5) the median latency period for malignant pleural mesothelioma, with which Dale was diagnosed, is 44.6 years among males; and (6) Dr. Maddox found the latency period for Dale's development of mesothelioma after exposure to Appellants' gaskets to be reasonable.  Therefore, this evidence also established specific causation and satisfied the elements of the substantial factor test.[15]

Appellants argue Respondents' causation evidence did not meet the substantial factor test because their experts "did not provide scientifically reliable evidence of either the amount of asbestos to which Dale was exposed from Crosby or Fisher products or the threshold exposure to asbestos above which he had an increased risk of developing mesothelioma."  Appellants maintain that the expert testimony is unreliable because it employed the "each and every exposure" theory of causation.  We disagree with Appellants' characterization of the expert testimony.  We also disagree with Appellants' implication that the substantial factor test requires a precise quantification of the number of asbestos fibers to which Dale was exposed and a "threshold exposure."  We will address these matters in turn.

The "each and every exposure" theory espouses the view that "'each and every breath' of asbestos is substantially causative of mesothelioma."  *See Rost*, 151 A.3d at 1044 ("[E]xpert testimony based upon the notion that 'each and every breath' of

_____

[15] *See Havner*, 953 S.W.2d at 720 ("To raise a fact issue on causation and thus to survive legal sufficiency review, a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies. This would include proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was consistent with that experienced by those in the study"); *Henderson*, 373 S.C. at 185, 644 S.E.2d at 727 ("In determining whether exposure is actionable, we adopt the 'frequency, regularity, and proximity test' set forth in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162[–63] (4th Cir. 1986): 'To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.'").

asbestos is substantially causative of mesothelioma will not suffice to create a jury question on the issue of substantial factor causation."); *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 31 (Pa. 2012) (noting the report of plaintiffs' causation expert concluded that each exposure is "a substantial contributing factor in the development of the disease that actually occurs" and did not assess the plaintiffs' individual exposure history "as this was thought to be unnecessary, given the breadth of the any-exposure theory" (emphasis removed)); *see also Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 846 (E.D.N.C. 2015) ("Also referred to as 'any exposure' theory, or 'single fiber' theory, it represents the viewpoint that, because science has failed to establish that any specific dosage of asbestos causes injury, every exposure to asbestos should be considered a cause of injury."). A significant number of jurisdictions have found the "each and every exposure" theory to be unreliable. *See, e.g.*, *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1177 (9th Cir. 2016); *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009); *Yates*, 113 F. Supp. 3d at 846 (listing jurisdictions); *In re New York City Asbestos Litig.*, 48 N.Y.S.3d 365, 370 (2017); *Betz*, 44 A.3d at 53 (stating that the trial court "was right to be circumspect about the scientific methodology underlying the any-exposure opinion. [The court] . . . was unable to discern a coherent methodology supporting the notion that every single fiber from among, potentially, millions is substantially causative of disease").

Respondents distinguish between the "each and every exposure" theory and the cumulative dose theory. They maintain that their experts relied on the cumulative dose theory and that their reliance on basic science in reaching their opinion is not the equivalent of testifying that "each and every exposure" was a substantial factor in causing Dale's mesothelioma. We agree. Respondents explain, "Even though the experts testified that *all exposures contribute to the cumulative dose that causes disease*, that does not mean that every exposure rises to the level of a *substantial factor*." (first emphasis added). Respondents note that this distinction was also made in *Rost*, a case in which Dr. Frank testified.

In *Rost*, the Supreme Court of Pennsylvania concluded,

> We must agree with the Rosts that Ford has confused or conflated the "irrefutable scientific fact" that every exposure cumulatively contributes to the total dose (which in turn increases the likelihood of disease), with the legal question under Pennsylvania law as to whether particular exposures to asbestos are "substantial factors" in causing the disease. It was certainly not this [c]ourt's intention, in [its precedent], to preclude expert witnesses from

informing juries about certain fundamental scientific facts necessary to a clear understanding of the causation process for mesothelioma, even if those facts do not themselves establish legal (substantial factor) causation. In this case, while Dr. Frank clearly testified that every exposure to asbestos cumulatively contributed to Rost's development of mesothelioma, he never testified that every exposure to asbestos was a "substantial factor" in contracting the disease.

Instead, by way of, inter alia, the lengthy hypothetical that detailed the entirety of Rost's exposure to asbestos-containing Ford products while at Smith Motors, Dr. Frank testified that Rost's **actual exposures** to asbestos at Smith Motors over three months was substantially causative of his mesothelioma. . . . . In other words, Dr. Frank did not testify that a single breath of asbestos while at Smith Motors caused Rost's mesothelioma, but rather that the entirety of his exposures during the three months he worked there caused his disease. In this regard, Dr. Frank stressed that, unlike with some other asbestos-related diseases (e.g., asbestosis), mesothelioma may develop after only relatively small exposures.

*Id.* at 1045–46.[16] *Rost* is particularly persuasive given that Dr. Frank testified in that case and his testimony was similar to his testimony in the present case. Moreover,

---

[16] *See also Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294, 1301 (11th Cir. 2017) (holding that the district court did not abuse its discretion in admitting expert testimony stating there is no evidence that there is a threshold level of exposure below which there is zero risk of mesothelioma and that all "significant" exposures to asbestos "contribute to cause mesothelioma"); *id.* (stating that the defendant mischaracterized the opinion of the plaintiff's expert "as essentially that 'any exposure' to asbestos is a substantial factor in causing mesothelioma, which it says makes his opinion scientifically unreliable. That is not what he said"); *id.* ("While [the plaintiff's expert] testified that all significant exposures to asbestos contribute to causing mesothelioma, he did not say that <u>any</u> exposure to asbestos is a substantial factor in causing mesothelioma, or even that every significant exposure causes it."); *id.* (stating that the expert's opinion was also based on an extensive knowledge of the facts in the case and was supported by scientific literature").

the other expert testimony on medical causation, including the application of scientific standards to Dale's occupational exposure history, was compelling.

Appellants assert that Respondents' distinction between the each and every exposure theory and the cumulative dose theory is artificial. They also assert that the presentation of the cumulative dose theory conflicts with the *Henderson/Lohrmann* substantial factor standard. We disagree with both assertions. Stating that a certain exposure *contributes* to an individual's cumulative dose does not espouse the view that "each and every breath" of asbestos is "substantially" causative of mesothelioma or imply that one exposure meets the legal requirement for causation.[17] We view the testimony concerning cumulative dose as background

---

[17] At oral argument, Appellants alleged that under cross-examination, Dr. Frank testified each of approximately 60 exposures was a substantial cause of Dale's mesothelioma. We disagree with Appellant's characterization of Dr. Frank's testimony. Counsel attempted to elicit an admission from Dr. Frank that he had earlier stated "any and all exposures [Dale] may have had from any product was a substantial cause of . . . his mesothelioma." Dr. Frank replied that he had not used the phrase "any and all" but had stated all of Dale's exposures from all products containing all fiber types were a substantial cause. It is clear that Dr. Frank rejected the "any" characterization and was clarifying that *collectively*, all of the exposures substantially caused Dale's mesothelioma.

Counsel then asked if these exposures would *include* products from General Electric, and Dr. Frank replied, "If they contained asbestos and if he was exposed, yes." Counsel then asked the same question as to numerous other businesses, one by one, to which Dr. Frank gave the same answer. Dr. Frank took care to clarify this answer part of the way through counsel's laundry list, stating, "Again, if he had exposures to such a product containing asbestos, it would have contributed to his cumulative exposure." It is clear that during this line of questioning, Dr. Frank was indicating Dale's collective exposures included products from the businesses mentioned by counsel if they contained asbestos and Dale was exposed to them.

Dr. Frank later stated that Dale's exposure to the product of one business would be "the contributing cause." We view his use of the article "the" as inconsistent with the term "contributing" and, thus, we attribute no significance to his use of this article. Subsequently, when asked about a product from another business, Dr. Frank stated, "If he was exposed to asbestos-containing John Crane packing, it would have been, in my opinion, a substantial contributing cause to his mesothelioma." Although he included the term "substantial" in this response, it was

information essential for the jury's understanding of medical causation, which must be based on science. We do not interpret this presentation as an attempt to supplant the *Henderson/Lohrmann* test.

Further, Dr. Frank supplemented this background information with his assessment of the probable level of exposure, 1 to 99 fibers per cubic centimeter, for each asbestos gasket removal and replacement Dale inspected. He further explained that this level is millions of times higher than background exposure and that the frequency of Dale's exposures over a four-year period accumulated to a level that could be considered a specific medical cause of Dale's mesothelioma. In other words, Respondents' experts were guided by the facts specific to Dale's exposure to Appellants' products in forming their opinions concerning causation. We note that the following factors on which Dr. Frank stated he routinely relies in examining a specific case are similar to the *Henderson* factors:

> In determining the relative contribution of any exposures to asbestos above background levels, it is important to consider a number of factors, including: the nature of exposure, the *level* of exposure and the *duration* of exposure, whether a product gives off respirable asbestos fibers, the level of exposure, whether a person was *close to or far from the source* of fiber release, how *frequently* the exposure took place and how long the exposure lasted, whether engineering or other methods of dust control were in place, and whether respiratory protection was used.

(emphases added). Likewise, the factors on which Dr. Maddox relied in forming his opinion overlap with the *Henderson* factors as they included how the exposure levels were measured, the standard that the exposure should be repetitive, dose response, and the exposures falling within a reasonable latency period.

---

qualified by the term "contributing" and, therefore, his response as a whole conveyed to the jury the mere contribution of Dale's exposure to this particular product to his cumulative dose. We decline to associate this isolated reference to the term "substantial" with either an adoption of the each and every exposure theory or a rejection of the legal requirement that a plaintiff's exposure to a particular defendant's product must be frequent, especially given Dr. Frank's previous statements in his affidavit that his opinions were medical and scientific and that he was not offering opinions about whether an exposure is substantial within the meaning of the law.

Appellants next argue that in addition to their valves, valves made by ten additional manufacturers were located where Dale worked and this decreased the likelihood that their own products caused Dale's mesothelioma. Yet, this argument is based on the faulty premise that a "but-for" standard of causation applies to mesothelioma cases when all *Lohrmann* requires is substantial causation shown by frequent, regular, and proximate exposure to the defendant's products. *See Henderson*, 373 S.C. at 185, 644 S.E.2d at 727 ("In determining whether exposure is actionable, we adopt the 'frequency, regularity, and proximity test' set forth in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162[–63] (4th Cir. 1986): 'To support a reasonable inference of *substantial causation* from circumstantial evidence, there must be evidence of exposure to a *specific product* on a *regular* basis over some *extended* period of time in *proximity* to where the plaintiff actually worked.'" (emphases added)); *Asbestos Litigation*, 131 HARV. L. REV. at 662 (analyzing an unpublished opinion of the United States District Court, District of South Carolina, and stating "although the court wrapped its conclusion in substantial factor language, it applied the but-for standard of specific causality—the same standard whose evidentiary difficulties elicited modifications of the test in the first place").

The substantial factor test formulated in *Lohrmann* merely requires a plaintiff to show "more than a casual or minimum contact with the product" of the defendant rather than a comparison of these exposures to the exposures to other defendants' products. 782 F.2d at 1162; *see also Rost*, 151 A.3d at 1050–51 ("[I]n asbestos products liability cases, evidence of 'frequent, regular, and proximate' exposures to the defendant's product creates a question of fact for the jury to decide. *This [c]ourt has never insisted that a plaintiff must exclude every other possible cause for his or her injury*, and in fact, we have consistently held that *multiple substantial causes* may combine and cooperate to produce the resulting harm to the plaintiff." (emphases added) (footnote omitted) (citation omitted)).

Based on the foregoing, we reject Appellants' argument that Respondents' evidence of substantial causation was insufficient. *See Duckett ex rel. Duckett v. Payne*, 279 S.C. 94, 96, 302 S.E.2d 342, 343 (1983) ("[T]he appellant carries the burden of convincing this [c]ourt that the [circuit] court erred."); *see also Curcio*, 355 S.C. at 320, 585 S.E.2d at 274 ("In considering a JNOV, the [circuit court] is concerned with the existence of evidence, not its weight."); *id.* ("The jury's verdict must be upheld unless no evidence reasonably supports the jury's findings."); *Williams Carpet Contractors*, 400 S.C. at 325, 734 S.E.2d at 180 ("When ruling on a JNOV motion, the [circuit] court is required to view the evidence and the

inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party."); *id.* ("This court must follow the same standard."); *id.* ("If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt, the case should be submitted to the jury." (quoting *Chaney v. Burgess*, 246 S.C. 261, 266, 143 S.E.2d 521, 523 (1965))); *Small*, 329 S.C. at 464, 494 S.E.2d at 843 ("Ordinarily, the question of proximate cause is one of fact for the jury and the [circuit court's] sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence."); *cf. Est. of Mims v. S.C. Dep't of Disabilities & Special Needs*, 422 S.C. 388, 403, 811 S.E.2d 807, 815 (Ct. App. 2018) (holding multiple inferences that could be drawn from the evidence precluded summary judgment and required a jury to determine the question of causation).

To the extent Appellants challenge the *admissibility* of Respondents' experts' testimony on the ground that it was unreliable,[18] they have failed to show any significant part of the testimony that could be reasonably characterized as espousing the "each and every exposure" theory. Further, the cumulative dose theory on which Respondents' experts relied easily meets the standard for reliability set forth in *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999). *See id.* at 20, 515 S.E.2d at 518 ("[T]he proper analysis for determining admissibility of scientific evidence is now under the SCRE. When admitting scientific evidence under Rule 702, SCRE, the [circuit court] must find the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable."); *id.* at 19, 515 S.E.2d at 517 (setting forth four of "several factors" a court should examine in considering the admissibility of scientific evidence: "(1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures").

---

[18] Technically, the circuit court's ruling on this issue may be considered the law of the case. In its order denying Appellants' JNOV motion, the circuit court concluded that the testimony of Respondents' experts was admissible, and Appellants have not explicitly appealed that ruling. *See* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered [that] is not set forth in the statement of the issues on appeal."); *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) ("[A]n unappealed ruling, right or wrong, is the law of the case."). However, we address the issue out of an abundance of caution. *See* Toal et al., *Appellate Practice in South Carolina* 208 (3d ed. 2016) ("[W]here an issue is not specifically set out in the statement of issues, the appellate court may nevertheless consider the issue if it is reasonably clear from the appellant's arguments.").

As to items (1) and (2) of the *Council* factors, Dr. Frank's affidavit indicates that scientists have analyzed cumulative asbestos exposure in order to ascribe causation in numerous peer-reviewed, published epidemiological studies, case series, and case reports. These publications "reinforce the scientific consensus that each occupational and para-occupational exposure to asbestos *contributes* to the cumulative lifetime asbestos exposure and increases a person's risk of developing mesothelioma." (emphasis added). As to item (3), Dr. Frank and his peers have not limited their analyses to the epidemiology of a substance but have also considered other scientific data, such as genetics, host factors, immunologic status, the relationship between risk and the level of exposure, and the dose-response principle. He stated,

> It is precisely because scientists and physicians understand the limitations of epidemiology and how certain factors can bias studies toward a lack of statistical significance or finding of a point estimate of no increased risk[] that we look at the epidemiology of a substance *along with* the other scientific data described above. Each epidemiological study must be evaluated for its strengths and weaknesses, and decisions about cause and effect should only be made on reliable data.

(emphasis added).

As to item (4), Dr. Frank stated that he follows the same weight-of-the-evidence methodology used by the International Agency for Research on Cancer, the World Health Organization, the National Institute for Occupational Safety and Health, and the Agency for Toxic Substances and Disease Registries in reaching his conclusions about the health effects of asbestos. He explained that the duties of these organizations are to evaluate the science and not to set policy. He also explained how the cumulative dose theory is consistent with the classic dose-response principle but noted that occupational and environmental epidemiology "is a blunt instrument and is not, in most cases, well suited to examining *precise* dose-response relationships." (emphasis added). Again, Dr. Frank's affidavit indicated that the cumulative dose theory has been analyzed in numerous epidemiological studies, case series, and case reports and "[w]hen examining the question of

causation of sentinel diseases like mesothelioma[,][19] the scientific community recognizes case reports and case series reports are useful and valid tools."

Moreover, Appellants have also failed to show there is a reasonable probability the jury's verdict was influenced by any testimony that could be reasonably characterized as espousing the each and every exposure theory. *See Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005) ("To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or the lack thereof."); *id.* at 31–34, 609 S.E.2d at 512–13 (holding the court of appeals erred in concluding the plaintiff showed prejudice from the exclusion of certain testimony because the plaintiff did not show a reasonable probability the jury was influenced by the exclusion). Nothing in the testimony of Respondents' experts indicates they were seeking to substitute their opinions on the science underlying mesothelioma for the legal standard on causation. To the contrary, Dr. Frank's affidavit explicitly stated that his opinions were his "medical and scientific opinions" and that he was "not offering legal opinions about whether an exposure is 'significant' or 'substantial' within the meaning of the law."

With the clear guidance from the circuit court's instructions on the law, which included the *Henderson/Lohrmann* standard, the jury was capable of distinguishing between the science-based testimony concerning medical causation and the legal standard for establishing causation in the face of multiple possible sources of the plaintiff's exposure. Therefore, the presence of any questionable language in isolated portions of the expert testimony paled in comparison to Dale's testimony and his experts' response to specific fact-based hypothetical questions. *See supra*.

Based on the foregoing, the circuit court acted well within its discretion in admitting the experts' testimony into evidence. *See Haselden v. Davis*, 341 S.C. 486, 497, 534 S.E.2d 295, 301 (Ct. App. 2000) ("The admissibility of evidence is within the [circuit] court's discretion. Absent a showing of a clear abuse of that discretion, the [circuit] court's admission or rejection of evidence is not subject to reversal on appeal." (footnote omitted)).[20]

---

[19] According to Dr. Frank's affidavit, a sentinel event is "a case of disease that, when it appears, signals the need for action."

[20] Appellants' additional argument that the expert testimony should have been excluded under Rule 403, SCRE is not preserved for review. The circuit court did not rule on this issue in its order addressing Appellants' post-trial motions, and

## B. Failure to Warn

As an additional ground for challenging the circuit court's denial of their JNOV motion, Appellants assert Respondents failed to meet their burden of proof on their failure-to-warn claims because (1) Appellants were protected by the sophisticated intermediary doctrine and (2) the danger of asbestos gaskets was open and obvious. We will address these two grounds in turn, but first we address Appellants' interjection of the burden of proof into their assignment of error. "In considering a JNOV, the [circuit court] is concerned with the existence of evidence, not its weight." *Curcio*, 355 S.C. at 320, 585 S.E.2d at 274. "The jury's verdict must be upheld unless no evidence reasonably supports the jury's findings." *Id.* In other words, neither the circuit court nor this court may re-weigh the evidence in determining whether it is necessary to set aside a jury's verdict.

We will now address Appellants' two grounds for challenging the jury's verdict on Respondents' failure-to-warn claims.

Reasonable Reliance/Sophisticated Intermediary Doctrine

This court first adopted the sophisticated intermediary doctrine in *Bragg v. Hi-Ranger, Inc.* when it upheld the following jury instruction given by the circuit court:

> [A] manufacturer has no duty to warn of potential risks or dangers inherent in a product if the product is distributed to what we call a learned intermediary or distributed to a sophisticated user who might be in a position to understand and assess the risks involved, and to inform the ultimate user of the risks, and to, thereby, warn the ultimate user of any alleged inherent dangers involved in

---

Appellants did not subsequently seek the circuit court's ruling on this issue in a Rule 59(e) motion. *See, e.g.*, *Noisette v. Ismail*, 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991) (noting the circuit court did not explicitly rule on a particular argument, the appellant failed to show it made a Rule 59(e) motion on this ground, and, therefore, this court should not have addressed the argument); *West v. Newberry Elec. Coop.*, 357 S.C. 537, 543, 593 S.E.2d 500, 503 (Ct. App. 2004) ("This issue was neither addressed by the [circuit court] in the final order nor mentioned in the subsequent Rule 59(e), SCACR, motion. As such, it is not preserved for review by this court.").

the product. Simply stated, the sophisticated user defense is permitted in cases involving an employer who was aware of the inherent dangers of a product which . . . the employer purchased for use in his business. Such an employer has a duty to warn his employees of the dangers of the product.

319 S.C. 531, 549, 462 S.E.2d 321, 331–32 (Ct. App. 1995). This court concluded that the circuit court correctly charged the jury and the charge "was an accurate recitation of the law." *Id.* at 551, 462 S.E.2d at 332.

"The [sophisticated intermediary] doctrine originated in the *Restatement Second of Torts*, section 388, comment n, . . . which addresses when warnings to a party in the supply chain are sufficient to satisfy the supplier's duty to warn." *Webb v. Special Elec. Co.*, 370 P.3d 1022, 1033 (Cal. 2016). "The Restatement drafters' most recent articulation of the sophisticated intermediary doctrine appears in the *Restatement Third of Torts, Products Liability*, section 2, comment i, at page 30. The drafters intended this comment to be substantively the same as section 388, comment n, of the Restatement Second of Torts." *Webb*, 370 P.3d at 1034. Comment i states, in pertinent part:

There is *no general rule* as to whether one supplying a product for the use of others through an intermediary has a duty to warn the ultimate product user directly or may rely on the intermediary to relay warnings. *The standard is one of reasonableness in the circumstances.* Among the factors to be considered are the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user.

*Restatement (Third) of Torts: Prods. Liab.* § 2, cmt. i (Am. Law. Inst. 1998) (emphases added).

In the present case, the circuit court instructed the jury on the doctrine and advised the jury that it was an affirmative defense for which Appellants bore the

burden of proof.[21]   The court later upheld the jury's verdict for Respondents, concluding (1) Appellants failed to show they knew Duke was aware or should have been aware of the danger from asbestos gaskets; (2) there was no evidence Appellants relied on Duke to warn its employees of the dangers of asbestos gaskets; and (3) Duke believed asbestos gaskets did not release fibers when disturbed and, thus, considered them to be harmless.[22]

Appellants contend they reasonably relied on Duke to comply with occupational safety laws, citing Dr. Frank's testimony admitting that OSHA regulations in effect from 1980 to 1984 permitted a certain level of asbestos exposure in the workplace.  Appellants also cite to the OSHA regulation requiring employers to take certain precautions when an employee will be exposed to asbestos dust.  However, it is not enough to show that the supplier's reliance would have been reasonable—the supplier must also show that it actually relied on the intermediary to convey warnings to end users.  *See Webb*, 370 P.3d at 1036 ("To establish a defense under the sophisticated intermediary doctrine, a product supplier must show

---

[21] *See Pike v. S.C. Dep't of Transp.*, 343 S.C. 224, 231, 540 S.E.2d 87, 91 (2000) (stating that the party pleading an affirmative defense has the burden of proving it).
[22] A November 21, 1984 script for an asbestos safety course provided to employees by Duke's construction department indicates Duke knew of the dangers of asbestos insulation but was unaware of the dangers of removing asbestos gaskets from a valve:

> Actually, asbestos is used very little in Duke Construction today, mostly to insulate electrical cabinets and pack valves, and it is used in gasket material.  Even so, the asbestos in these jobs is bonded, which means it produces virtually no dust.

> In the past, however, nonbonded asbestos has been used for insulation throughout the Duke system.  So there's a good chance asbestos dust is present wherever old insulation is being removed.

The script is consistent with the testimony of Duke employee David Taylor, who indicated that Duke distinguished between asbestos insulation, which it warned employees about when Dale worked as a mechanical inspector, and the asbestos in gaskets, which Duke failed to warn employees about until the late 1980s or early 1990s.

not only that it warned or sold to a knowledgeable intermediary, but also that it *actually* and reasonably relied on the intermediary to convey warnings to end users. This inquiry will typically raise questions of fact for the jury to resolve unless critical facts establishing reasonableness are undisputed." (emphasis added)).

Here, Fisher's corporate representative testified that the reason Fisher did not warn anyone about the dangers of asbestos gaskets was because the company did not consider them to be a health risk. Crosby's corporate representative also indicated that Crosby did not consider the gaskets in their valves to be dangerous. This belies Appellants' claims that they relied on Duke to warn Dale of the dangers of asbestos gaskets. Therefore, the circuit court properly left within the province of the jury the question of whether Appellants actually relied on Duke to warn Dale about their gaskets. *See Webb*, 370 P.3d at 1036 (stating that a product supplier "must show not only that it warned or sold to a knowledgeable intermediary, but also that it *actually* and reasonably relied on the intermediary to convey warnings to end users. This inquiry will typically raise questions of fact *for the jury to resolve* unless critical facts establishing reasonableness are undisputed." (emphases added)).

Appellants also maintain that Duke actually warned its employees of the dangers of asbestos. However, the evidence indicates that when Dale worked as a mechanical inspector, Duke distinguished between asbestos insulation and asbestos gaskets and considered the latter to be harmless. *See supra* n.22. It was not until the late 1980s or early 1990s that Duke began warning its employees of the dangers of dust from asbestos gaskets. By then, Duke instructed its employees to wear a respirator or mask and to spray down a gasket with water before removing it from a flange.

Finally, Appellants contend they could not have reasonably warned Dale of the danger associated with their gaskets because Dale would not have seen any warning labels on the gaskets when his co-workers began grinding them up. However, Dale would have seen a warning on a replacement gasket when verifying the number on that gasket. This would have alerted him to the need to take precautions during future gasket removals. Further, Appellants do not address the feasibility of placing a warning on the outside of the valve. Instead, they argue that Respondents did not raise this possibility at trial and have not shown that a warning on the valve would have been effective or feasible. Yet, Respondents did not have this burden at trial. Rather, it was Appellants' burden to show that they met the standard for the sophisticated intermediary doctrine. *See Pike*, 343 S.C. at 231, 540 S.E.2d at 91; *see also Webb*, 370 P.3d at 1034 ("Because the sophisticated intermediary doctrine is an affirmative defense, the supplier bears the burden of

proving that it adequately warned the intermediary, or knew the intermediary was aware or should have been aware of the specific hazard, and reasonably relied on the intermediary to transmit warnings.").

Moreover, on appeal, it is Appellants' burden to convince this court that the circuit court erred in upholding the jury's verdict as to this defense. *See Duckett*, 279 S.C. at 96, 302 S.E.2d at 343. Because Appellants themselves have not shown that a warning on the outside of the valve would have been ineffective or infeasible, we reject their argument that they could not have reasonably warned Duke employees of the danger associated with their gaskets.

Based on the foregoing, the circuit court properly upheld the jury's verdict as to the sophisticated intermediary doctrine.

Open and Obvious Danger

Next, Appellants assert that the danger of asbestos gaskets was open and obvious and Dale admitted he knew asbestos was dangerous. Therefore, Appellants argue, they were entitled to a JNOV on Respondents' failure-to-warn claims. We disagree.

Appellants rely on *Moore v. Barony House Rest., LLC*, 382 S.C. 35, 41–42, 674 S.E.2d 500, 504 (Ct. App. 2009) for the proposition that a seller has no duty to warn of an "open and obvious" danger created by its products or a danger that the product's users generally recognize. However, "[w]hen reasonable minds may differ as to whether the risk was obvious or generally known, the issue is to be decided by the trier of fact." *Restatement (Third) of Torts: Prods. Liab.* § 2, cmt. j (1998). Here, the record shows that during Dale's employment as a mechanical inspector, Duke distinguished between asbestos insulation, which it warned employees about, and asbestos gaskets, which Duke considered harmless. Further, although Dale admitted he was warned to avoid areas where old asbestos insulation was being removed, he indicated that he and his co-workers were not made aware of the full extent of the potential for harm from asbestos exposure. Therefore, reasonable minds may differ as to whether the danger of developing cancer from exposure to asbestos gaskets was obvious or generally recognized by Duke employees.

There is no evidence that any safety information about asbestos gaskets was provided to any employees before safety course instructors received a teaching guide in September 1984, nearly four years after Dale first became a mechanical inspector, and that information merely stated that asbestos gaskets produced virtually no dust.

According to David Taylor, Duke did not warn employees about the danger associated with asbestos gaskets until the late 1980s or early 1990s, after Dale was no longer a mechanical inspector. Taylor testified that by the late 1980s, Duke required employees involved with the removal of gaskets from valves to wear a respirator and to wet the gasket before removal to minimize the liberation of the dust. Taylor also testified that the only way a typical employee could know that a particular gasket he or she was working with was made of asbestos was if its packaging had been labeled as containing asbestos. Therefore, a reasonable juror could have inferred that the danger associated with the removal of asbestos gaskets from valves was one that was not obvious to Dale or generally recognized by other Duke employees involved with that process before the late 1980s.

We acknowledge Dale's testimony that his training as a mechanical inspector included distinguishing asbestos gaskets from other types of gaskets and that he could see the dust produced by the removal of certain gaskets from valves. Thus, a juror could draw a reasonable inference that Dale was aware of some health risk posed by the dust generated when a co-worker removed an asbestos gasket from a valve. Yet, in the light most favorable to Dale, an equally reasonable inference from the evidence is that Dale had no clear or timely warning that his proximity to the removal of gaskets from Appellants' valves would cause him to develop mesothelioma. Dale testified that Duke had designated "respirator zones" that employees were prohibited from entering without a respirator, employees were accustomed to receiving a specific directive to wear a respirator for a specific job, and they could not obtain a respirator without first receiving such a directive. During the years Dale worked as a mechanical inspector, employees in proximity to the removal of asbestos gaskets from valves were not directed to wear a respirator.

Appellants also argue the only reasonable inferences from the evidence are that Dale did not heed Duke's warnings about asbestos and, therefore, would not have heeded a warning from Appellants. Appellants contend that Dale "made clear during his testimony that he knew about the hazards of asbestos . . . and that he in fact did not heed warnings from Duke and continued to work around Fisher and Crosby valves despite his knowledge of the alleged hazards." We disagree with Appellants' characterization of the testimony in question. That testimony is consistent with the other evidence indicating that from 1980 to 1984, Duke did not warn its employees of the dangers of asbestos gaskets. *See supra*. Further, we do not interpret the testimony as an admission that Dale knowingly placed himself within proximity of dust from asbestos insulation. Finally, even if the testimony, combined with the other testimony concerning Dale's training, would allow a

reasonable juror to infer that Dale did not heed Duke's warning about asbestos in general, this is not the only reasonable inference.

Based on the foregoing, the circuit court properly upheld the jury's verdict on Respondents' failure-to-warn claims. *See Restatement (Third) of Torts: Prods. Liab.* § 2, cmt. j ("When reasonable minds may differ as to whether the risk was obvious or generally known, the issue is to be decided by the trier of fact.").

## C.    Design Defect

Next, Appellants assert there was no evidence of a reasonable alternative design for the asbestos gaskets used in their valves and, thus, they were entitled to a JNOV on Respondents' negligence and implied warranty claims. We disagree.

"A product can be defective because of a flaw in its design." *Madden v. Cox*, 284 S.C. 574, 579, 328 S.E.2d 108, 112 (Ct. App. 1985). "Liability for a design defect may be based on negligence, strict tort, or warranty." *Id.* "In an action based on strict tort or warranty, plaintiff's case is complete when he has proved the product, as designed, was in a defective condition *unreasonably dangerous* to the user when it left the control of the defendant, and the defect caused his injuries." *Id.* at 579–80, 328 S.E.2d at 112 (emphasis added). "Liability for negligence requires, in addition to the above, proof that the manufacturer breached its duty to exercise reasonable care to adopt a safe design." *Id.* at 580, 328 S.E.2d at 112. "This burden may be met by showing that the manufacturer was aware of the danger and failed to take reasonable steps to correct it." *Id.*

In analyzing design defect claims, South Carolina courts apply the "risk-utility" test, which weighs the danger associated with the product's use against its utility. *See Bragg*, 319 S.C. at 543, 462 S.E.2d at 328 ("[A] product is unreasonably dangerous and defective if the danger associated with the use of the product outweighs the utility of the product."); *id.* at 544, 462 S.E.2d at 328 ("[I]n South Carolina[,] we balance the utility of the risk inherent in the design of the product with the magnitude of the risk to determine the reasonableness of the manufacturer's action in designing the product."). In *Branham v. Ford Motor Company*, our supreme court refined the risk-utility test to incorporate the American Law Institute's most recent definition of a design defect:

> A product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a *reasonable*

*alternative design* by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

390 S.C. 203, 223–24, 701 S.E.2d 5, 16 (2010) (emphasis added) (quoting *Restatement (Third) of Torts: Prods. Liab.* § 2(b) (1998)). Based on this definition, the court set forth the following framework for a plaintiff seeking to establish a design defect claim:

> [I]n a product liability design defect action, the plaintiff must present evidence of a reasonable alternative design. The plaintiff will be required to point to a design flaw in the product and show how his alternative design would have prevented the product from being unreasonably dangerous. This presentation of an alternative design must include consideration of the costs, safety and functionality associated with the alternative design.

*Id.* at 225, 701 S.E.2d at 16. In other words,

> [t]he analysis asks the trier of fact to determine whether the potential increased price of the product (if any), the potential decrease in the functioning (or utility) of the product (if any), and the potential increase in other safety concerns (if any) associated with the proffered alternative design are worth the benefits that will inhere in the proposed alternative design.

*Id.* n.16. "The state of the art and industry standards are relevant to show . . . the reasonableness of the design . . . ." *Bragg*, 319 S.C. at 543, 462 S.E.2d at 328.

Here, the circuit court concluded that the evidence created a fact issue for the jury as to the existence of a reasonable alternative design. We agree. We acknowledge that the record shows Duke used the safety valves it purchased from Appellants for high-pressure, high-heat applications—the temperature exceeded 1,000 degrees, and the pressure was approximately 1,200 pounds per square inch. If these valves were not working correctly, the connecting lines could explode, endangering any nearby persons. Asbestos, as opposed to other substances such as fiberglass, rubber, cork, or vegetable fibers, could safely stand up to the extreme

conditions of temperature and pressure. An asbestos gasket was one of the best-performing gaskets for these conditions. Dale, who had been trained in the types of gaskets that could be used in various temperature and pressure settings, explained that a rubber gasket would melt at 1,200 degrees.

On the other hand, Fisher's corporate representative, Ronald Dumistra, admitted that Fisher had non-asbestos gaskets available for its customers. Dumistra also admitted that for high-pressure, high-temperature applications, a metal gasket could have been used. Therefore, a metal gasket was a candidate for the jury's consideration of a reasonable alternative design, given that Dumistra seemed to consider its functionality and safety to be equivalent to that of asbestos gaskets. Further, there was no evidence that a metal gasket was more expensive than an asbestos gasket. Even if there had been such evidence, a juror could have reasonably inferred from the expert testimony on causation that the risk of exposing Duke employees to deadly asbestos fibers was so grave that no economic cost savings would have been worth that risk. *See Branham*, 390 S.C. at 225 n.16, 701 S.E.2d at 16 n.16 ("The analysis asks the trier of fact to determine whether the potential increased price of the product (if any), the potential decrease in the functioning (or utility) of the product (if any), and the potential increase in other safety concerns (if any) associated with the proffered alternative design are *worth the benefits* that will inhere in the proposed alternative design." (emphasis added)); *Bragg*, 319 S.C. at 543, 462 S.E.2d at 328 ("[A] product is unreasonably dangerous and defective if the danger associated with the use of the product *outweighs* the utility of the product." (emphasis added)); *Restatement (Third) of Torts: Prods. Liab.* § 2 cmt. f (1998) ("A plaintiff is not necessarily required to introduce proof on all of [the factors that may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe]; their relevance, and the relevance of other factors, will vary from case to case.").

Therefore, the circuit court properly concluded that the evidence created a fact issue for the jury. *See Gastineau*, 331 S.C. at 568, 503 S.E.2d at 713 (holding that a motion for a JNOV "may be granted only if no reasonable jury could have reached the challenged verdict.").

**D. Deviation from Standard of Care**

Next, Appellants argue they are entitled to a JNOV on Respondents' negligence claim because they did not present any evidence of the applicable standard of care or Appellants' deviation from such a standard. Specifically, Appellants assert that (1) Respondents' citation of government regulations was not

sufficient evidence of the standard of care; and (2) Respondents did not present evidence of a reasonable alternative design and, therefore, failed to establish that Appellants deviated from any applicable standard of care. We disagree.

"Evidence of industry standards, customs, and practices is 'often highly probative when defining a standard of care.'" *Elledge v. Richland/Lexington Sch. Dist. Five*, 341 S.C. 473, 477, 534 S.E.2d 289, 290 (Ct. App. 2000) (quoting 57A Am. Jur. 2d *Negligence* § 185 (1999)), *aff'd*, 352 S.C. 179, 573 S.E.2d 789 (2002). "Safety standards promulgated by government or industry organizations in particular are relevant to the standard of care for negligence." *Id.* at 477, 534 S.E.2d at 290–91; *see also Albrecht v. Balt. & Ohio R.R. Co.*, 808 F.2d 329, 332–33 (4th Cir. 1987) ("'In a negligence action, regulations promulgated under . . . [OSHA] provide evidence of the standard of care exacted of employers, but they neither create an implied cause of action nor establish negligence per se.' . . . That rule is consistent with 29 U.S.C. § 653(b)(4)[,] which provides . . . that OSHA shall not be construed to supersede, diminish or affect the common law or statutory duties or liabilities of employers with respect to injuries to their employees." (quoting *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 707 (5th Cir. 1981), *abrogated on other grounds by Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 743 (5th Cir. 2018))); *Phelps v. Duke Power Co.*, 332 S.E.2d 715, 717 (N.C. Ct. App. 1985) (holding that the trial court erred in excluding evidence relating to the National Electrical Safety Code because it was "instructive as to whether an electrical company used reasonable care" and, therefore, "admissible as an aid to the prudent or reasonable man rule"); *McComish v. DeSoi*, 200 A.2d 116, 121 (N.J. 1964) ("[A safety] code is not introduced as substantive law, as proof of regulations or absolute standards having the force of law or of scientific truth. It is offered in connection with expert testimony which identifies it as illustrative evidence of safety practices or rules generally prevailing in the industry, and as such it provides support for the opinion of the expert concerning the proper standard of care."); *Stone v. United Eng'g*, 475 S.E.2d 439, 454 (W.Va. 1996) ("Courts have become increasingly appreciative of the value of national safety codes and other guidelines issued by governmental and voluntary associations to assist the trier of fact in applying the standard of due care in negligence cases."); 57A Am. Jur. 2d *Negligence* § 758 ("A number of safety codes and other forms of objective standards of safe construction, operation, and the like, have been developed, issued, or published by governmental authorities, or by voluntary associations, as informative or advisory standards. Where such a code is adopted by an administrative agency pursuant to legislative authority, or after adoption by the agency[,] such code is ratified by the legislature, the code has the force of law, and its violation may constitute negligence per se, or, at least, evidence of negligence." (footnote omitted)).

Here, Respondents' occupational medicine expert, Dr. Frank, testified that by 1960, the scientific community had established a causal connection between asbestos exposure and mesothelioma. Dr. Frank, who has been a consultant to the National Institute for Occupational Safety and Health and an advisor to OSHA, further testified that by 1980, OSHA regulations required products containing asbestos to carry a warning label and Appellants were subject to these regulations. To obtain an exemption from the warning label requirement, the manufacturer had to test the product to demonstrate that it did not liberate asbestos fibers into the surrounding environment. Although Appellants manufactured only the valves they sold to Duke and not the asbestos gaskets inside the valves, they had a responsibility to test these components to verify that they would not release fibers. *See Duncan v. Ford Motor Co.*, 385 S.C. 119, 133, 682 S.E.2d 877, 884 (Ct. App. 2009) ("A manufacturer who incorporates into his product a component made by another has a responsibility to test and inspect such component, and his negligent failure to properly perform such duty renders him liable for injuries proximately caused as a consequence.").[23]

Further, Dr. Frank indicated Appellants were on notice of the dangers of asbestos and, thus, could have advised Duke to caution employees that if they were going to liberate dust from the asbestos gaskets in Appellants' valves, they needed to do so in a manner that would reduce their exposure. Dr. Frank explained that when an asbestos gasket is new, it is encapsulated, but after normal use of the product, it deteriorates. Dr. Frank further explained that as the asbestos gasket is broken down, especially when removed from a flange with scrapers and electrical equipment, more and more fibers are liberated. Dr. Frank stated that if the resulting dust is visible, as Dale witnessed, the level of exposure is very high, and in fact, there may be millions or billions of asbestos fibers present when the dust is visible.

Appellants' corporate representatives admitted that when Dale worked as a mechanical inspector, Appellants never provided any warnings to their customers or users, they never applied warning labels to their products, and they did not conduct any testing to determine whether maintenance activities would liberate asbestos fibers into the air. Further, the evidence and the reasonable inferences from that

---

[23] This is consistent with the testimony of Crosby's corporate representative, Robert Martin, who stated that industry standards required valve manufacturers to be responsible for every component between the "inlet flange" and the "outlet flange."

evidence show that Appellants' use of metal gaskets in their valves would have been a reasonable alternative to their use of asbestos gaskets. *See supra*.

Based on the foregoing, Respondents presented sufficient evidence of both the standard of care and Appellants' deviation from that standard.

## II.     Additur

Appellants challenge the circuit court's granting of Respondents' motion for a new trial *nisi additur* on the ground that the court based its ruling on speculation and did not articulate compelling reasons for increasing the damages awards. We disagree.

"When the verdict indicates that the jury was unduly liberal or conservative in its view of the damages, the [circuit court] alone has the power to [alter] the verdict by the granting of a new trial *nisi*." *Riley v. Ford Motor Co.*, 414 S.C. 185, 192, 777 S.E.2d 824, 828 (2015) (quoting *Allstate Ins. Co. v. Durham*, 314 S.C. 529, 531, 431 S.E.2d 557, 558 (1993)). "The consideration of a motion for a new trial *nisi additur* requires the [circuit court] to consider the adequacy of the verdict in light of the evidence presented." *Vinson v. Hartley*, 324 S.C. 389, 405, 477 S.E.2d 715, 723 (Ct. App. 1996). Motions for a new trial *nisi* "are addressed to the sound discretion of the [circuit court]." *Riley*, 414 S.C. at 192, 777 S.E.2d at 828 (quoting *Graham v. Whitaker*, 282 S.C. 393, 401, 321 S.E.2d 40, 45 (1984)). However, the circuit court's exercise of discretion "is not absolute[,] and it is the duty of this [c]ourt in a proper case to review and determine whether there has been an abuse of discretion amounting to error of law." *Id.* at 192–93, 777 S.E.2d at 828–29 (quoting *Graham*, 282 S.C. at 401–02, 321 S.E.2d at 45); *see also Sapp v. Wheeler*, 402 S.C. 502, 512, 741 S.E.2d 565, 571 (Ct. App. 2013) ("The grant or denial of a motion for a new trial *nisi* rests within the discretion of the [circuit court] and [its] decision will not be disturbed on appeal unless [its] findings are wholly unsupported by the evidence or the conclusions reached are controlled by error of law." (quoting *Waring v. Johnson*, 341 S.C. 248, 256, 533 S.E.2d 906, 910 (Ct. App. 2000))). "'Compelling reasons' must be given to justify the [circuit] court invading the jury's province in this manner." *Riley*, 414 S.C. at 193, 777 S.E.2d at 829.

"The [circuit court] who heard the evidence and is more familiar with the evidentiary atmosphere at trial possesses a better-informed view of the damages than this [c]ourt." *Vinson*, 324 S.C. at 405, 477 S.E.2d at 723. "Accordingly, *great deference is given to the [circuit court]*." *Id.* at 406, 477 S.E.2d at 723 (emphasis added); *see also Riley*, 414 S.C. at 194, 777 S.E.2d at 829 ("[T]he court of appeals

ignored the applicable abuse-of-discretion standard of review, instead focusing its inquiry on a de novo evaluation of whether, in its view, there was sufficient justification for 'invading the jury's province.' This was error."). *But see Todd v. Joyner*, 385 S.C. 509, 517, 685 S.E.2d 613, 618 (Ct. App. 2008) (per curiam) ("'While the granting of such a motion rests within the sound discretion of the [circuit] court, *substantial deference must be afforded to the jury's determination of damages*.' To this end, the [circuit] court must offer compelling reasons for invading the jury's province by granting a motion for additur." (emphasis added) (citation omitted) (quoting *Green v. Fritz*, 356 S.C. 566, 570, 590 S.E.2d 39, 41 (Ct. App. 2003))), *aff'd*, 385 S.C. 421, 685 S.E.2d 595 (2009).[24]

Here, the jury awarded $200,000 in compensatory damages to Dale and $100,000 to Brenda for loss of consortium. The circuit court concluded that the award to Dale was "inadequate and should be increased to more accurately reflect the extent of their losses." The circuit court then observed, "[t]he jury only awarded [Dale] medical expenses in the amount of $142,000, plus $58,000 for pain and suffering." Appellants argue this observation was speculative and, therefore, cannot serve as a compelling reason to grant an additur. Appellants point out that no medical bills were introduced into evidence and the verdict form did not ask the jury to designate respective amounts for medical expenses and pain and suffering. Appellants maintain that these omissions make it impossible to know (1) how much of the $200,000 award was for medical expenses or (2) whether the loss of consortium award to Brenda included medical expenses.

Appellants also maintain that "parsing" a verdict is prohibited in the absence of a special verdict form. In support of this proposition, Appellants cite to *Jenkins v. Few*, 391 S.C. 209, 705 S.E.2d 457 (Ct. App. 2010) and *Moore v. Moore*, 360 S.C. 241, 257, 599 S.E.2d 467, 475 (Ct. App. 2004). In *Jenkins*, the appellant argued that the circuit court "erred in declining to reduce the jury's award of actual damages for trespass to personal property," but two other causes of action were also submitted to the jury, and the parties had chosen to use a general verdict form. 391 S.C. at 220–21, 705 S.E.2d at 463. This court stated that it was impossible to determine how the jury allocated damages between the three causes of action and declined to speculate as to the allocation. *Id.* at 221, 705 S.E.2d at 463. Therefore, the court left the circuit court's ruling undisturbed. *Id.*

---

[24] We acknowledge that the body of our case law has seemingly inconsistent standards for reviewing the granting of a new trial *nisi*. We follow in the footsteps of our supreme court's most recent opinion involving a new trial *nisi additur*, *Riley*, by giving due deference to the circuit court's exercise of discretion.

In *Moore*, the appellant argued that the circuit court should not have submitted a breach of fiduciary duty claim to the jury because the respondent did not prove damages with reasonable certainty. 360 S.C. at 253, 599 S.E.2d at 473. This court noted that more than one measure of damages was available for breach of fiduciary duty and concluded that without a special verdict form to determine whether the damages were for lost profit or some other measure, the court would have to engage in speculation to address the appellant's assignment of error. *Id.* at 256–57, 599 S.E.2d at 475. Declining to do so, the court upheld the circuit court's submission of the claim to the jury. *Id.* at 257, 599 S.E.2d at 475.

Neither *Jenkins* nor *Moore* created a generalized rule of law applicable to circuit courts in reviewing the suitability of a jury verdict. In each case, the appellant submitted an assignment of error that required this court to engage in a speculative determination of the components of a jury's general verdict. Thus, this court's conclusions in *Jenkins* and *Moore* were case-specific. If any general rule may be gleaned from these conclusions, it is the time-honored rule that no factual or legal determination may be based on speculation.

In the present case, we do not view the circuit court's observation about the jury's award of medical costs as speculative. *See Speculate*, Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/speculate* (last visited August 25, 2021) (defining "speculate" as "to take to be true on the basis of insufficient evidence"). Rather, the observation was based on Dr. Frank's testimony that he had seen some of the medical bills and the amount he saw was $142,000. Therefore, the circuit court's observation was a reasonable inference from that evidence. Further, it is highly unlikely that the loss of consortium verdict, which was only $100,000, included medical expenses, given the medical bill Dr. Frank saw was for $142,000.

It is more likely that the jury awarded Dale $142,000 for medical expenses and the remainder of the $200,000 ($58,000) for non-economic damages. *Cf. Riley*, 414 S.C. at 193–95, 777 S.E.2d at 829–30 (observing that the plaintiff presented expert testimony that the decedent's family suffered over $228,000 in economic damages; stating that the circuit court "was well aware that the [$300,000] jury verdict included an award of noneconomic damages, yet . . . articulated compelling circumstances that [the circuit court] believed warranted the nisi additur;" and holding that there was no abuse of discretion); *Waring*, 341 S.C. at 260, 533 S.E.2d at 912 ("As to Johnson's claim the jury's verdict may have been intended to represent a portion of Waring's medical expenses, plus pain and suffering, we find this

argument patently untenable. The jury's award of exactly the amount of Waring's medical expenses, to the penny, is an attempt to reimburse her for those very expenses."); *Williams v. Robertson Gilchrist Const. Co.*, 301 S.C. 153, 155, 390 S.E.2d 483, 484 (Ct. App. 1990), *overruled on other grounds by O'Neal v. Bowles*, 314 S.C. 525, 431 S.E.2d 555 (1993) (concurring in the circuit court's conclusion that a damages award in the exact amount of the economic losses as presented by the plaintiff's expert economist indicated the jury's disregard of testimony concerning a funeral bill and non-economic losses); *Jones v. Ingles Supermarkets, Inc.*, 293 S.C. 490, 494, 361 S.E.2d 775, 777 (Ct. App. 1987), *overruled on other grounds by O'Neal v. Bowles*, 314 S.C. 525, 431 S.E.2d 555 (holding the circuit court properly granted a new trial *nisi additur* based on the jury's award matching the exact amount of proven economic loss and failing to award noneconomic damages).

Therefore, unlike the posture of this court in *Jenkins* and *Moore*, the circuit court in the present case possessed concrete information from the evidence on which it could base its observation about the jury's award of medical costs. *See Vinson*, 324 S.C. at 405, 477 S.E.2d at 723 ("The consideration of a motion for a new trial *nisi additur* requires the [circuit court] to consider the adequacy of the verdict *in light of the evidence presented*." (emphasis added)); *id.* ("The [circuit court] who *heard the evidence* and is more familiar with the evidentiary atmosphere at trial possesses a better-informed *view of the damages* than this [c]ourt." (emphases added)).

Moreover, we do not view this particular observation as critical to the circuit court's discretionary determination that the jury's overall verdict was inadequate. After making its observation about the jury's award of medical costs, the circuit court recited the law on all categories of damages applicable to the case and thoroughly summarized the evidence supporting an increased verdict. *See infra*. The circuit court concluded that the evidence supported damages for medical expenses, pain and suffering, loss of enjoyment of life, mental anguish, and future damages and "[t]he jury's award of only $200,000 was not sufficient to make [Dale] whole for the magnitude of his losses." *Cf. Bailey v. Peacock*, 318 S.C. 13, 14, 455 S.E.2d 690, 692 (1995) (reversing the circuit court's granting of a new trial *nisi additur* because the circuit court made no finding that the verdict was inadequate). The essence of the circuit court's ruling was the inadequacy of the overall verdict in light of the evidence presented at trial. Inconsequential language included in that ruling is not a valid basis for reversal. *See Sapp*, 402 S.C. at 512, 741 S.E.2d at 571 ("The grant or denial of a motion for a new trial *nisi* rests within the discretion of the trial [court] and [its] decision *will not be disturbed* on appeal unless [its] findings are *wholly*

unsupported by the evidence or the conclusions reached are *controlled by* error of law." (emphases added) (quoting *Waring*, 341 S.C. at 256, 533 S.E.2d at 910)); *Vinson*, 324 S.C. at 405, 477 S.E.2d at 723 ("The consideration of a motion for a new trial *nisi additur* requires the [circuit court] to consider the adequacy of the verdict *in light of the evidence presented*." (emphasis added)); *id.* ("The [circuit court] who *heard the evidence* and is more familiar with the evidentiary atmosphere at trial possesses a better-informed *view of the damages* than this [c]ourt." (emphases added)).

Appellants also challenge the circuit court's respective summaries of the evidence regarding medical expenses, noneconomic damages, and loss of consortium damages. As to medical expenses, Appellants assert that the circuit court's reliance on Respondents' evidence was misplaced because that evidence was speculative. We disagree.

"Generally, in order for damages to be recoverable, the evidence should be such as to enable the court or jury to determine the amount thereof with *reasonable* certainty or accuracy." *Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 43, 691 S.E.2d 135, 146 (2010) (emphasis added) (quoting *Whisenant v. James Island Corp.*, 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981)). Although the amount of damages may not "be left to conjecture, guess or speculation, proof with mathematical certainty of the amount of loss or damage is not required." *Id.* Further, "[i]n a personal injury action, the plaintiff must recover for all injuries, past *and prospective*, which arose and *will arise* from the defendant's tortious activity." *Haltiwanger v. Barr*, 258 S.C. 27, 32, 186 S.E.2d 819, 821 (1972) (emphases added) (quoting 22 Am. Jur. *Damages* § 27). "Thus, recovery must be had for future pain and suffering, and for the reasonable value of medical services and impaired earning capacity, to the extent that these injuries are *reasonably* certain to result in the future from the injury complained of." *Id.* (emphasis added) (quoting 22 Am. Jur. *Damages* § 27). In many instances, a verdict that includes future damages "must be approximated." *Id.* at 32–33. Additionally,

> [a] plaintiff in a personal injury action seeking damages for the cost of medical services provided to him as a result of a tortfeasor's wrongdoing is entitled to recover *the reasonable value of those medical services, not necessarily the amount paid*. Although the amount paid may be relevant in determining the reasonable value of those services, the trier of fact must look to a variety of other factors in making such a finding. Among those

factors to be considered by the jury are the amount billed to the plaintiff, and the relative market value of those services. Clearly, *the amount actually paid for medical services does not alone determine the reasonable value of those medical services. Nor does it limit the finder of fact in making such a determination.*

*Haselden v. Davis*, 353 S.C. 481, 484, 579 S.E.2d 293, 295 (2003) (emphases added) (citations omitted). Notably, the opinion of a medical expert has been held to reliably indicate the reasonable value of past and future medical care when it is based on medical data specific to the plaintiff's case. *See Koenig v. Johnson*, No. 2:18-CV-3599-DCN, 2020 WL 2308305, at *10–12 (D.S.C. May 8, 2020).

In the present case, by the time of trial, Dr. Frank had been a specialist in both internal medicine and occupational medicine for over thirty-seven years and involved in scientific research on the topics of asbestos and mesothelioma for almost fifty years. In addition to his medical degree, he held a doctorate in biomedical sciences. He also taught courses in environmental medicine and biomedical science. He testified that he reviewed Dale's medical records, testimony, and medical bills and those bills were in line with costs typically associated with treatment of mesothelioma. Dr. Frank also provided a thorough account of the progression of Dale's mesothelioma and his past treatments before assigning a likely cost to all past and future medical costs. *Cf. Koenig*, 2020 WL 2308305 at *10 (noting the plaintiff's expert explained how the plaintiff's diagnoses required certain medical treatment); *id.* at *11 (observing that the expert's cost estimates were based on a review of the plaintiff's medical record and the expert's forty years of experience in rehabilitative medicine and holding the expert's experience and education in the field provided a reliable basis for his opinion on the cost of the plaintiff's future medical care). Dr. Frank estimated that all of Dale's past and future medical expenses would likely range from hundreds of thousands of dollars to $1 million or more. Dr. Frank attributed this estimate to the fact that Dale had already endured approximately 18 months of ongoing care and extensive treatment, including a complicated surgery. Specifically, Dr. Frank stated:

Cases like his[,] with the kind of extensive treatment and surgery he's had, *clearly* hundreds of thousands. Cases even go to a million dollars or more. So his would be at the high end, given all the things that he's had. Obviously, somebody who comes in, gets diagnosed and dies in a month, their costs are less. He's had ongoing care and

extensive care for a long period of time. The surgery alone could be hundreds of thousands of dollars. And then with everything else, he would be at the high end of what these kinds of cases cost.

(emphasis added). Dr. Frank further explained that it is likely Dale will die from mesothelioma, and closer to the time of death, the medical interventions and hospitalizations will become more intense and more expensive, such as intravenous feedings and eventually hospice. Appellants' own expert, Dr. James Crapo, admitted that before Dale's death, he would "very likely" have more hospitalizations. Dr. Crapo also admitted that it was likely Dale would eventually need supplemental oxygen and require around-the-clock nursing care. At the time of trial, Dale was undergoing experimental treatment involving immunotherapy as an alternative to the chemotherapy Dale could no longer endure. Dr. Frank confirmed that all of Dale's treatments were medically necessary.

Given Dr. Frank's thorough review and interpretation of Dale's medical data, "viewed through the lens of his extensive and specialized experience, training, and education," we reject Appellants' claim that Dr. Frank's testimony on the cost of Dale's medical care was speculative. *Koenig*, 2020 WL 2308305 at *10 (declining to exclude the opinions of the plaintiff's expert physician regarding the cost of plaintiff's future medical care and holding the opinions were reliable because they were based on the expert's "interpretation of objective medical data viewed through the lens of his extensive and specialized experience, training, and education").

In its order granting Respondents' new trial *nisi*, the circuit court observed,

> Dr. Frank testified, *without dispute*, that the total cost of [Dale's] past and future medical care, from the time of his diagnosis to the time of his death, would reasonably be $1,000,000. This undisputed testimony took into account some of [Dale's] past medical bills of $142,000, plus the cost of his surgery that was hundreds of thousands of dollars.

> The jury heard evidence that [Dale] is currently undergoing an experimental therapy that requires him to go for treatments and doctor visits several times a week. Experts on both sides agreed that [Dale] would likely die

from mesothelioma and that his medical needs would increase as he got sicker and closer to death.

(emphasis in original) (transcript citations omitted).

Appellants characterize the above language as "crediting [Dr.] Frank's speculation about medical costs as undisputed evidence that the jury had to believe." Yet, Appellants have not argued that Dr. Frank was unqualified to testify regarding medical costs. While the jury was not required to believe Dr. Frank's testimony,[25] the circuit court was not precluded from exercising its discretion to consider this testimony credible. *See Vinson*, 324 S.C. at 405, 477 S.E.2d at 723 ("The consideration of a motion for a new trial nisi additur requires the [circuit court] to consider the adequacy of the verdict *in light of the evidence presented*." (emphasis added)); *id.* ("The [circuit court] who *heard the evidence* and is more familiar with the evidentiary atmosphere at trial possesses a better-informed *view of the damages* than this [c]ourt." (emphases added)); *id.* at 406, 477 S.E.2d at 723 ("Accordingly, *great deference is given to the [circuit court]*." (emphasis added)); *Sapp*, 402 S.C. at 512, 741 S.E.2d at 571 ("The grant or denial of a motion for a new trial *nisi* rests within the discretion of the [circuit court] and [its] decision will not be disturbed on appeal unless [its] findings are *wholly* unsupported by the evidence or the conclusions reached are controlled by error of law." (emphasis added) (quoting *Waring*, 341 S.C. at 256, 533 S.E.2d at 910))*; see also Riley*, 414 S.C. at 194, 777 S.E.2d at 829 ("[T]he court of appeals ignored the applicable abuse-of-discretion standard of review, instead focusing its inquiry on a *de novo* evaluation of whether, in its view, there was sufficient justification for 'invading the jury's province.' This was error."); *id.* at 192, 777 S.E.2d 824, 828 ("When the verdict indicates that the jury was unduly liberal or conservative in its view of the damages, the [circuit court] alone has the power to [alter] the verdict by the granting of a new trial *nisi*." (quoting *Durham*, 314 S.C. at 531, 431 S.E.2d at 558)). Rather, the circuit court's determination that the verdict should adequately reflect Dr. Frank's reliable opinion on the enormous past and future expenses of Dale's disease serves as a compelling reason to increase the damages award.

As to noneconomic damages, the circuit court first examined awards for pain and suffering in comparable cases. *See Lucht v. Youngblood*, 266 S.C. 127, 136, 221 S.E.2d 854, 858 (1976) ("The comparison approach is helpful and sometimes forceful, however, each case must be evaluated as an individual one, within the

---

[25] *See Steele v. Dillard*, 327 S.C. 340, 343–44, 486 S.E.2d 278, 280 (Ct. App. 1997) (holding that the jury was not required to believe uncontradicted evidence).

framework of its distinctive facts."); *Kapuschinsky v. United States*, 259 F. Supp. 1, 8 (D.S.C. 1966) ("Admittedly not controlling, but worthy of note are treatments of verdicts from all over this country."). The circuit court noted, "Damages awards for pain and suffering in comparable mesothelioma cases range from $1.5 million to more than $20 million." The court cited numerous examples of verdicts within this range being upheld by courts across the country.

The circuit court then summarized in stark detail the evidence presented as to Dale's pain and suffering, loss of enjoyment of life, and mental anguish, and this summary is supported by the testimony.[26] *Cf. Riley*, 414 S.C. at 194, 777 S.E.2d at 829 (upholding an additur of $600,000 in a wrongful death action and noting the circuit court gave a thorough recitation of the "uncontested, and emotionally compelling" evidence of economic and noneconomic losses suffered by the decedent's family); *id.* at 194–95, 777 S.E.2d 824, 830 (observing that the circuit court was aware that the jury's $300,000 verdict, which included over $228,000 in economic damages, included an award of noneconomic damages and acted within its discretion in granting additur by articulating compelling circumstances that the presiding judge believed warranted additur); *Jones*, 293 S.C. at 494, 361 S.E.2d at 777 (holding the circuit court properly granted a new trial *nisi additur* based on the jury's award matching the exact amount of proven economic loss and failing to award noneconomic damages).

As to the $100,000 award to Brenda for loss of consortium, the circuit court highlighted Brenda's fifty-one-year marriage to Dale, the neglect of her own health to care for Dale, her fear, and her potential future loss of at least ten more years with Dale.

Based on the foregoing, the circuit court acted well within its discretion in granting Respondents' motion for new trial *nisi additur*. *See Sapp*, 402 S.C. at 512, 741 S.E.2d at 571 ("The grant or denial of a motion for a new trial *nisi* rests within the discretion of the trial [court] and [its] decision will not be disturbed on appeal unless [its] findings are wholly unsupported by the evidence or the conclusions reached are controlled by error of law." (quoting *Waring*, 341 S.C. at 256, 533 S.E.2d at 910)).

---

[26] In addition to the testimony summarized in the circuit court's order, we note Appellants' expert admitted that mesothelioma is one of the more aggressive cancers and as the disease progresses, the pain is so intense that "heavy doses of narcotic medication[ are] necessary" to control it.

## III.    Setoff

Prior to trial, Respondents received $2,270,000 in settlement proceeds from Appellants' co-defendants.  Respondents allocated one-third of the total proceeds ($756,667) to Dale's claims; one-third to Brenda's claims; and one-third to "the release of future claims."  Appellants contend the circuit court erred by accepting Respondents' allocation of one-third of the total proceeds to a "future wrongful death claim."  Appellants argue that in addition to the partial setoff the court awarded them for Dale's claims ($756,667) against the damages awarded to Dale ($1,580,000), they were entitled to a setoff of the one-third Respondents allocated for future claims.  We disagree.

"The right to setoff has existed at common law in South Carolina for over 100 years."  *Riley*, 414 S.C. at 195, 777 S.E.2d at 830.  "Allowing setoff 'prevents an injured person from obtaining a double recovery for the damage he sustained, for it is almost universally held that there can be only one satisfaction for an injury or wrong.'"  *Id.* (quoting *Rutland v. S.C. Dep't of Transp.*, 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012)).  "In 1988, these equitable principles were codified as part of the South Carolina Contribution Among Tortfeasors Act . . . ."[27]  *Id.*   In particular, section 15-38-50 provides in pertinent part,

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort *for the same injury* or the same wrongful death . . . it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but *it reduces the claim against the others* to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater[.]

(emphases added).  "Therefore, before entering judgment on a jury verdict, the court must reduce the amount of the verdict to account for any funds previously paid by a settling defendant, so long as the settlement funds were paid to compensate *the same plaintiff* on a claim for the *same injury*."  *Smith v. Widener*, 397 S.C. 468, 471–72, 724 S.E.2d 188, 190 (Ct. App. 2012) (emphases added).  In other words, "[a] non-settling defendant is entitled to credit for the amount paid by another defendant who

---

[27] S.C. Code Ann. §§ 15-38-10 to -70 (2005 and Supp. 2020).

settles *for the same cause of action*." *Riley*, 414 S.C. at 195, 777 S.E.2d at 830 (emphasis added) (quoting *Rutland*, 400 S.C. at 216, 734 S.E.2d at 145).

"When the settlement is for the same injury, the nonsettling defendant's right to a setoff arises by operation of law." *Smith*, 397 S.C. at 472, 724 S.E.2d at 190. "Under this circumstance, '[s]ection 15-38-50 grants the court no discretion . . . in applying a [setoff].'" *Id.* (quoting *Ellis v. Oliver*, 335 S.C. 106, 113, 515 S.E.2d 268, 272 (Ct. App. 1999)). On the other hand, when the settlement "involves more than one claim, the allocation of settlement proceeds between various causes of action impacts the amount a non-settling defendant may be entitled to offset." *Riley*, 414 S.C. at 196, 777 S.E.2d at 830; *see also Smith*, 397 S.C. at 473, 724 S.E.2d at 191 ("[W]hen the prior settlement involves compensation for a different injury from the one tried to verdict, there is no setoff as a matter of law.").

Here, upon an *in camera* review of the releases executed by Respondents in favor of Appellants' co-defendants, the circuit court verified a settlement amount of $2,270,000. The record does not indicate that the parties to these settlements either agreed to allocate the settlement proceeds among the respective claims released or sought court approval of the agreements. Rather, during a post-trial hearing, Respondents advised the circuit court, "internally, [Respondents] have allocated the [settlement proceeds] as follows: one-third for [Dale's] claims; one-third for [Brenda's] claims; and one-third for the release of future claims." The circuit court "confirmed that all future claims related to [Dale's] mesothelioma, including wrongful death, were released by [Respondents]." The circuit court then concluded that Respondents' internal allocation of the settlement proceeds was reasonable and declined to apply a setoff for the amount Respondents allocated to "future claims related to [Dale's] mesothelioma, including wrongful death," because any such future claims for which the settling defendants were released were distinct from the personal injury and loss of consortium claims tried to verdict. *See Smith*, 397 S.C. at 473, 724 S.E.2d at 191 ("[W]hen the prior settlement involves compensation for a different injury from the one tried to verdict, there is no setoff as a matter of law.").

Initially, we question whether section 15-38-50 contemplates the "internal allocation" that was merely claimed by Respondents post-settlement rather than designated by all parties to the settlement agreement. *See* § 15-38-50 ("When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death . . . it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated *by the release or the covenant, or in*

*the amount of the consideration paid for it*, whichever is the greater[.]" (emphasis added)).  However, our case law favors a plaintiff's ability to apportion settlement proceeds "in the manner most advantageous to it." *Riley*, 414 S.C. at 197, 777 S.E.2d at 831.

Appellants argue that the circuit court should not have accepted Respondents' allocation of one-third of the settlement proceeds to a future wrongful death claim because "that claim is barred as a matter of law" by Respondents' execution of the releases.  We disagree with the logic of this argument, but we will explain its premise:  Although a wrongful death claim is for the benefit of the decedent's family,[28] South Carolina treats this claim as derivative of the decedent's own personal claim during his lifetime. *See Estate of Stokes ex rel. Spell v. Pee Dee Family Physicians, L.L.P.*, 389 S.C. 343, 349, 699 S.E.2d 143, 146 (2010) (holding that a wrongful death claim "lies in the decedent's estate only when the decedent possessed the right of recovery at his death"); *id.* at 347, 699 S.E.2d at 145 ("[I]f the decedent had no claim at his death, the estate has no claim.").  If the decedent settled, or prosecuted to judgment, his personal injury claims against a certain defendant during his lifetime, his heirs or beneficiaries are precluded from bringing a wrongful death claim against that defendant after the decedent's death. *Id.*; *see also* S.C. Code

---

[28] *See Welch v. Epstein*, 342 S.C. 279, 304, 536 S.E.2d 408, 421 (Ct. App. 2000) (indicating a decedent's heirs or beneficiaries may recover the following damages in a wrongful death action: "(1) pecuniary loss; (2) mental shock and suffering; (3) wounded feelings; (4) grief and sorrow; (5) loss of companionship; and (6) deprivation of the use and comfort of the intestate's society, including the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries"); *see also* S.C. Code Ann. § 15-51-10 (2005) ("Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony."); S.C. Code Ann. § 15-51-20 (2005) ("Every such action shall be *for the benefit of the wife or husband and child or children of the person whose death shall have been so caused*, and, if there be no such wife, husband, child or children, then for the benefit of the parent or parents, and if there be none such, then for the benefit of the heirs of the person whose death shall have been so caused. Every such action shall be brought by or in the name of the executor or administrator of such person." (emphasis added)).

Ann. § 15-51-60 (2005) (precluding the application of the Wrongful Death Act to "any case in which the person injured has, for such injury, brought action, which has proceeded to trial and final judgment before his or her death."); *Restatement (Second) of Judgments* § 46 cmt. b (1982) ("The claim for wrongful death that arises in favor of the decedent's family, dependents, or representative can be characterized as either 'derivative' from the injured person's own claim or 'independent' of it. If the claim for wrongful death is treated as wholly 'derivative,' the beneficiaries of the death action can sue only if the decedent would still be in a position to sue. . . . [S]*ettlement of the decedent's personal injury claim or its reduction to judgment for or against the alleged tortfeasor extinguishes the wrongful death claim against that tortfeasor*." (emphasis added) (citation omitted)).

Nonetheless, if there is a significant chance that the injury in dispute will cause the plaintiff's death before he can complete the prosecution of his personal injury claim, both the personal injury claim and a future wrongful death claim pose genuine risks for a defendant seeking to settle the case until those claims are actually released as part of the settlement. Therefore, we reject Appellants' assumption that if a settling defendant obtains a release of the personal injury claim, then it is unreasonable for that defendant to also obtain a release of any future wrongful death claim due to its derivative nature. Were this assumption to control how settlement proceeds are allocated, it would allow a non-settling defendant to second-guess the settling defendant's choice of the claims for which it will pay the plaintiff to release. Only the settling parties get that choice. *Cf. Riley*, 414 S.C. at 197, 777 S.E.2d at 831 ("A plaintiff who enters into a settlement with a defendant gains a position of control and acquires leverage in relation to a nonsettling defendant. This posture is reflected in *the plaintiff's ability to apportion the settlement proceeds in the manner most advantageous to it. Settlements are not designed to benefit nonsettling third parties.* They are instead created by the settling parties in the interests of these parties. If the position of a nonsettling defendant is worsened by the terms of a settlement, this is the consequence of a refusal to settle. *A defendant who fails to bargain is not rewarded with the privilege of fashioning and ultimately extracting a benefit from the decisions of those who do*." (emphases added) (quoting *Lard v. AM/FM Ohio, Inc.*, 901 N.E.2d 1006, 1019 (Ill. App. 2009))); *id.* ("Settling parties are naturally going to allocate settlement proceeds in a manner that serves their best interests. That fact alone is insufficient to justify appellate reapportionment for the sole purpose of benefitting [the non-settling defendant].").

Further, Appellants' assignment of error does not logically flow from their premise that the wrongful death claim is precluded by the release of the personal injury claim. Should the settling parties effect a simultaneous release of personal

injury and future wrongful death claims within the same document, as was done here, the resulting preclusion of a future prosecution of *either* claim does not affect how the settlement proceeds given in consideration for the release are allocated among these released claims. By way of comparison, no one would doubt that the simultaneous release of a personal representative's claims for survival and wrongful death precludes the future prosecution of both claims, yet it is common practice to allocate settlement proceeds among those claims.[29] Here, Respondents' release of all past and future claims against the settling defendants should not affect the allocation of the settlement proceeds among the various claims that were released— the settlement proceeds were the very consideration for Respondents' release of their claims. It logically follows that those proceeds should be allocated among the claims that were released. Therefore, we reject Appellants' argument that the circuit court should not have accepted Respondents' allocation of one-third of the settlement proceeds to "future claims related to [Dale's] mesothelioma, including wrongful death," because "that claim [wrongful death] is barred as a matter of law."

Appellants also maintain that the settlement amount Respondents allocated to a future wrongful death claim compensates for the same injuries at issue in the present case. They state that wrongful death claims "allow a decedent's heirs to pursue the decedent's personal injury claims after his or her death." In making this conclusion, Appellants rely on *Burroughs v. Worsham*, 352 S.C. 382, 406, 574 S.E.2d 215, 227 (Ct. App. 2002), for the proposition that a wrongful death claim is to compensate the heirs of a decedent, who, if he had survived, could have brought a personal injury action. We do not interpret this proposition as defining the nature of a wrongful death claim or the damages recoverable under such a claim. Rather, it is simply the expression of a prerequisite for the right of the decedent's heirs to recover their own damages in a wrongful death action. *See supra*.

As to personal injuries sustained by the decedent during his lifetime, damages are recoverable through a survival claim should he die before prosecuting a personal injury claim, and it is common for a personal representative of a decedent's estate to assert both a survival claim and a wrongful death claim in the same litigation. *See* S.C. Code Ann. § 15-5-90 (2005) ("Causes of action for and in respect to . . . any and all injuries to the person . . . shall survive both to and against the personal or real representative, as the case may be, of a deceased person . . . , any law or rule to the contrary notwithstanding."); *Scott v. Porter*, 340 S.C. 158, 170, 530 S.E.2d 389, 395 (Ct. App. 2000) ("Unlike actual damages in a wrongful death action, actual damages

---

[29] *See, e.g.*, *Riley*, 414 S.C. at 190–91, 777 S.E.2d at 827 (referencing the parties' "agreed-upon, and court-approved, settlement allocation").

in a survival action are awarded for the benefit of the decedent's estate rather than for the family."). Therefore, we reject Appellants' argument that the amount Respondents allocated to a future wrongful death claim compensates for the same injuries at issue in the present case. *See Smith*, 397 S.C. at 473 n.1, 724 S.E.2d at 191 n.1 (noting that wrongful death and survival actions are different claims for different injuries); *Welch*, 342 S.C. at 303–04, 536 S.E.2d at 420–21 (distinguishing between damages in a survival action and those for a wrongful death action); *id.* at 303, 536 S.E.2d at 420–21 ("Actual damages in a survival action are awarded for the benefit of the decedent's estate. Appropriate damages in survival actions include those for medical, surgical, and hospital bills, conscious pain, suffering, and mental distress of the deceased." (citation omitted)).

Finally, Appellants maintain that accepting Respondents' allocation allows them a double recovery because (1) the circuit court instructed the jury that the plaintiff "may recover for those future damages that are reasonably certain to result" and (2) the circuit court invoked Dale's expected death in justifying its increase in Dale's and Brenda's damages awards. As to the first ground, Appellants' argument is based on their mistaken assumption that the future wrongful death claim relates to the same injuries for which Dale was compensated in the present action. *See supra* (discussing the distinction between a survival claim and a wrongful death claim). The circuit court's jury instruction on future damages related to Dale's future medical expenses and future pain and suffering likely to occur up to the time of his death. These future damages are recoverable by Dale in the present action (or in a survival action had Dale died prior to trial). In contrast, the future wrongful death claim released by Respondents would have sought compensation for the damages suffered by Dale's heirs or beneficiaries after his death. *See supra*.

As to the second ground, the circuit court justified its increase in Dale's award by recounting the testimony concerning the process of dying and the suffering Dale would experience while dying. Again, these future damages are recoverable by Dale in the present action (or in a survival action had Dale died prior to trial) but not by heirs or beneficiaries in a wrongful death action. *See supra*. On the other hand, the circuit court justified its increase in Brenda's loss of consortium award by describing how Dale's mesothelioma had affected Brenda up to the time of trial and noting that Brenda's time with Dale would be "cut short by at least ten years." Nonetheless, this reference to the time with Dale that Brenda could lose overlaps with merely one or two elements out of many for the damages recoverable in a wrongful death action. Further, the loss of consortium award will compensate Brenda only rather than all of Dale's heirs or beneficiaries. Therefore, this slight overlap in damages does not rise to the level of a "double recovery."

In sum, the circuit court's refusal to allow a setoff of the settlement proceeds allocated to "future claims related to [Dale's] mesothelioma, including wrongful death," did not result in a double recovery for Respondents. Therefore, we affirm the circuit court's setoff ruling. *See Riley*, 414 S.C. at 195, 777 S.E.2d at 830 ("Allowing setoff 'prevents an injured person from obtaining a *double recovery* for the damage he sustained, for it is almost universally held that there can be only one satisfaction for an injury or wrong.'" (emphasis added) (quoting *Rutland*, 400 S.C. at 216, 734 S.E.2d at 145)).

## IV. Motion to Quash

Appellants challenge the circuit court's denial of their respective motions to quash subpoenas requiring their corporate representatives to appear and testify at trial. They argue (1) Rule 45, SCRCP, does not authorize courts to exercise subpoena power over out-of-state parties and (2) the subpoenas were not properly served on them. We will address these arguments in turn.

Power to compel

Rule 45(a)(2), SCRCP, requires a subpoena commanding attendance at a trial to be issued from the court for the county in which the trial will be conducted. Further, an attorney authorized to practice in that court may issue and sign the subpoena on the court's behalf. Rule 45(a)(3), SCRCP. Here, on July 12, 2017, Respondents' counsel delivered trial subpoenas by courier to Appellants' counsel in Charleston, and counsel himself signed for the delivery. The subpoenas were directed to "Defendant Fisher Controls International, LLC; through Counsel of Record" and "Defendant Crosby Valves, LLC; through Counsel of Record," respectively. Subsequently, Appellants filed their respective motions to quash the subpoenas on the grounds that the circuit court did not have the power to compel out-of-state parties to attend trial and they were not properly served pursuant to Rule 45.

The circuit court conducted a hearing by telephone and orally denied Appellants' respective motions. Appellants' corporate representatives appeared and testified at trial, and the circuit court later issued a written order denying their motions to quash. In its order, the circuit court rejected Appellants' argument that their non-resident status precluded the court from compelling them to send representatives to testify at trial. The court emphasized that Appellants were parties

to the case and submitted to the court's jurisdiction by making a general appearance and litigating the case to trial.

Appellants now assert that a court "does not gain unlimited subpoena power when a party 'submits to the jurisdiction' of the court." Appellants argue there is no overlap between the doctrines of personal jurisdiction and subpoena power. In support of their argument, Appellants cite *Syngenta Crop Prot., Inc. v. Monsanto Co.*, 908 So.2d 121, 128 (Miss. 2005), for the proposition that the "concepts of personal jurisdiction and subpoena power are altogether different." However, we note this statement was made within the context of addressing subpoena power over a foreign corporation that was a non-party: "[T]he provisions of Section 79-4-15.10(a) do not provide for the issuance of a subpoena duces tecum for service upon a foreign corporation's registered agent for service of process, when that foreign corporation is *not a party* to the litigation." *Id.* (emphasis added).

Appellants further argue, "Just as Congress established geographic limits to the federal courts' subpoena power, *see* Fed. R. Civ. P. 45(c)(1), the South Carolina General Assembly established that a state court's subpoena power exists only within South Carolina." We disagree. The legislature did not intend to limit the circuit court's power to subpoena a party or a corporate party's representative when it adopted the current language of Rule 45, which includes the travel burden of non-parties as a ground for quashing a subpoena:

> On timely motion, the court . . . shall quash or modify the subpoena if it:
>
> . . .
>
> (ii) requires a person *who is not a party nor an officer, director or managing agent of a party, nor a general partner of a partnership that is a party*, to travel more than 50 miles from the county where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held[.]

Rule 45(c)(3)(A)(ii), SCRCP (emphasis added). Our legislature could have easily left out the language "who is not a party . . ." from this provision if it did not intend

for the circuit court to have subpoena power over a party.  Instead, this language clearly indicates that parties and their principals may not avail themselves of the non-party travel-burden ground for quashing a subpoena.[30]  *See CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011) ("[W]e must read the statute so 'that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous,' for '[t]he General Assembly obviously intended [the statute] to have some efficacy, or the legislature would not have enacted it into law.'" (citation omitted) (alterations in original) (quoting *State v. Sweat*, 379 S.C. 367, 377, 382, 665 S.E.2d 645, 651, 654 (Ct. App. 2008), *aff'd as modified on other grounds*, 386 S.C. 339, 688 S.E.2d 569 (2010))); *S.C. Dep't of Consumer Affs. v. Rent-A-Ctr., Inc.*, 345 S.C. 251, 255–56, 547 S.E.2d 881, 883–84 (Ct. App. 2001) ("The canon of construction '*expressio unius est exclusio alterius*' or '*inclusio unius est exclusio alterius*' holds that 'to express or include one thing implies the exclusion of another, or of the alternative.'" (quoting *Hodges v. Rainey*, 341 S.C. 79, 86, 533 S.E.2d 578, 582 (2000))); *Ex parte Wilson*, 367 S.C. 7, 15, 625 S.E.2d 205, 209 (2005) ("In interpreting the meaning of the South Carolina Rules of Civil Procedure, the [c]ourt applies the same rules of construction used to interpret statutes.").

---

[30] Likewise, the legislature could have modeled our Rule 45(c) after the language in the federal rule highlighted by Appellants, which includes parties and their principals in the travel-burden limitation on the court's subpoena power:

> A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
>
> > (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
> >
> > (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
> >
> > > (i) is a party or a party's officer; or
> > >
> > > (ii) is commanded to attend a trial and would not incur substantial expense.

Fed. R. Civ. P. 45(c)(1).  Yet our legislature chose not to adopt this language.

Further, the official note to the 1995 amendment to Rule 45 states, in pertinent part:

> Rule 45(c)(3)(A)(ii) and 45(c)(3)(B)(iii) are amended to make clear that a non-party general partner of a partnership that is a party, is treated the same as an officer, director or managing agent of a party for purposes of trial subpoenas. Rule 45(c)(3) provides a *non-party*, subpoenaed to appear at trial more than fifty miles from the place of service, the opportunity to move to quash the subpoena unless a special showing of need is made and reasonable compensation is provided to the witness. *These special provisions are not available to parties or officers, directors and managing agents of parties.* The amendment extends the *exclusion* to a general partner of a partnership that is a party.

(emphases added). This confirms that the legislature intended for South Carolina circuit courts to have subpoena power over parties to proceedings over which those courts preside.

This is consistent with the broad discretionary power a circuit court must exercise over parties to proceedings before it in order to effectively dispense justice. *See Capital City Ins. Co. v. BP Staff, Inc.*, 382 S.C. 92, 103, 674 S.E.2d 524, 530 (Ct. App. 2009) ("The court has broad discretion in its supervision over the progression and disposition of a circuit court case in the interests of justice and judicial economy."); *S.C. Dep't of Highways & Pub. Transp. v. Galbreath*, 315 S.C. 82, 85, 431 S.E.2d 625, 628 (Ct. App. 1993) ("The conduct of trial . . . is largely within the [circuit court's] sound discretion, the exercise of which will not be disturbed on appeal absent an abuse of that discretion or the commission of legal error that results in prejudice for the appellant."); *cf. Hayden v. 3M Co.*, 211 So. 3d 528, 532 (La. App. 2017) ("In the same way that Louisiana exercises personal jurisdiction over parties participating in litigation in the state, those parties may, upon the discretion of the court, be compelled to appear in Louisiana for discovery depositions, hearings, and/or trial. For these reasons[,] we reverse the trial court's quashing of the subpoenas served through the attorneys of record for the non-domiciliary corporations.").

Based on the foregoing, we reject Appellants' argument that the circuit court did not have subpoena power over them.

Validity of service

Next, Appellants contend that service of the subpoenas on their counsel in Charleston was defective because Rule 4, SCRCP, requires service on a person "authorized by [Appellants] to accept service of process—the companies' registered agents" and Appellants have no registered agent in South Carolina.  We disagree.

Rule 45(b), SCRCP, allows a subpoena to be served at any place within the state by any person who is not a party and is at least 18 years of age "in the same manner prescribed for service of a summons and complaint in Rule 4(d) or (j)."  Rule 4(d) provides for service of process through not only personal service (Rule 4(d)(1) through (6)) but also statutory service (Rule 4(d)(7)), certified mail (Rule 4(d)(8)), or commercial delivery service (Rule 4(d)(9)).  Further, Rule 4(j) recognizes the long standing practice of acceptance of service as equivalent to personal service:  "No other proof of service shall be required when acceptance of service is acknowledged in writing and signed by the person served or his attorney, and delivered to the person making service."  *See Langley v. Graham*, 322 S.C. 428, 431–32, 472 S.E.2d 259, 261 (Ct. App. 1996) (stating that Rule 4(j) is "a recognition of the long standing practice that acknowledgement or acceptance of service is equivalent to personal service.").

Here, the circuit court concluded that service of the subpoenas was valid under Rule 4(j) because Appellants' Charleston counsel signed for the package containing the subpoenas.  Appellants argue that Rule 4(j) does not change "the requirement in Rule 4(d)(3) that service on a corporation must be made to 'an officer, a managing or general agent, or to any other agent authorized by appointment or by law' . . . ."  Appellants maintain that service "must be made to a registered agent to be effective; the attorney's acknowledgement of receipt does not make service effective."  We disagree.

The language of Rule 45(b) allows a choice between service of a subpoena in the various manners set forth in Rule 4(d) or obtaining a written and signed acceptance of service from the person to whom the subpoena is directed or his attorney, as provided in Rule 4(j):  "Service of a subpoena upon a person named therein shall be made *in the same manner prescribed for service of a summons and complaint* in Rule 4(d) *or* (j)."  (emphases added).  Although the language of Rule 4(j) primarily focuses on the substitution of a party's, or his attorney's, written acknowledgement of service for the proof of service required by Rule 4(g), the unmistakable reference to Rule 4(j) in Rule 45(b) as prescribing a method for service

of process indicates that the drafter intended for acceptance of service to serve as an alternative to other methods of serving a subpoena. This is consistent with the note to the 2002 amendment to Rule 45, which states, in pertinent part:

> The first 2002 amendment amends Rule 45(b)(1) to permit service of subpoenas by the same method as used to serve a summons and complaint. First, in addition to in hand service of the subpoena, service on an individual could be made by leaving the subpoena at the person's home or usual place of abode with a person of suitable age and discretion then residing there as provided in Rule 4(d)(1). Second, a subpoena could be served on an individual, a corporation, or a partnership by registered or certified mail, return receipt requested and delivery restricted to the addressee under Rule 4(d)(8). *In addition, the person or the person's attorney may accept service under Rule 4(j).*

(emphasis added). Therefore, we reject Appellants' argument that the attorney's acknowledgement of receipt under Rule 4(j) does not make service effective.

As to the application of Rule 4(j) to the present case, we note that Appellants argued before the circuit court that counsel did not accept service on their behalf pursuant to Rule 4(j) because counsel did not know the contents of the packages containing the subpoenas when he signed for them. However, on appeal, Appellants have merely set forth a one-sentence conclusory argument in a footnote with no supporting authority; therefore, we consider it abandoned. *See* Rule 208(b)(1)(E), SCACR ("At the head of each part, the particular issue to be addressed shall be set forth in distinctive type, followed by discussion and citations of authority."); *S.C. Dep't of Soc. Servs. v. Mother ex rel. Minor Child*, 375 S.C. 276, 283, 651 S.E.2d 622, 626 (Ct. App. 2007) ("[W]e note this issue is abandoned because Mother makes a conclusory argument without citation of any authority to support her claim."); *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 99, 594 S.E.2d 485, 496 (Ct. App. 2004) ("Numerous cases have held that where an issue is not argued within the body of the brief but is only a short conclusory statement, it is abandoned on appeal."); *Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691–92 (Ct. App. 2001) (holding that a conclusory argument in a footnote, which cited no supporting authority, was deemed abandoned); *State v. Cutro*, 332 S.C. 100, 108 n.1, 504 S.E.2d 324, 328 n.1 (1998), (Toal, J., dissenting) ("[A] one-sentence argument is too conclusory to present any issue on appeal.").

We also note that service was valid under either Rule 4(d)(3), which governs personal service on a corporation, or Rule 4(d)(9), which allows for service by a commercial delivery service. Respondents used the FedEx First Overnight service to deliver the subpoenas to Appellants' counsel. Rule 4(d)(9) allows the use of a commercial delivery service to effect service of a summons and complaint on an individual or a corporation if the commercial delivery service meets the requirements to be considered a designated delivery service in accordance with 26 U.S.C. § 7502(f)(2). We note that the IRS has included the FedEx First Overnight service in its list of designated private delivery services. *See Designation of Private Delivery Servs.*, 2016-18 I.R.B. 676 (2016). As to who may sign for a package delivered pursuant to Rule 4(d)(9), we draw guidance from the following language:

> Service pursuant to this paragraph shall not be the basis for the entry of a default or a judgment by default unless the record contains a delivery record showing *the acceptance by the defendant which includes an original signature or electronic image of the signature of the person served*. Any such default or judgment by default shall be set aside pursuant to Rule 55(c) or Rule 60(b) if the defendant demonstrates to the court that the delivery receipt was *signed by an unauthorized person*. If delivery of the process is refused or is returned undelivered, service shall be made as otherwise provided by these rules.

Rule 4(d)(9) (emphases added). Therefore, the court should focus on whether the person who signed for a package delivered by a commercial service was authorized by the defendant to accept service of process.

Appellants assert their Charleston counsel was not authorized to accept service of process on their behalf. Appellants claim that Rule 4(d) requires personal service and to effect service on a corporation, the plaintiff must serve the corporation's registered agent within the state. We disagree. Personal service is one of multiple options for service of process under Rule 4(d), and Rule 4(d)(3), which governs personal service on a corporation, does not limit those who are authorized to accept service to registered agents:

> Service shall be made as follows: . . . Upon a corporation or upon a partnership or other unincorporated association which is subject to suit under a common name, *by delivering a copy of the summons and complaint to an*

> *officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process* and if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant.

(emphasis added). Rule 4(d)(1), which governs service on individuals, includes similar language regarding authorized agents: "or by delivering a copy to an *agent authorized by appointment or by law to receive service of process*." (emphasis added). In *Hamilton v. Davis*, this court interpreted Rule 4(d)(1) in the following manner:

> S.C.R.C.P. 4(d)(1), like its federal counterpart, Rule 4(d)(1) of the Federal Rules of Civil Procedure, provides for service upon an agent only if authorized by appointment or by law. Federal cases dealing with agency by appointment indicate an actual appointment for the specific purpose of receiving process normally is expected and the mere fact a person may be considered to act as defendant's agent for some purpose does not necessarily mean that the person has authority to receive process. *The courts must look to the circumstances surrounding the relationship and find authority which is either express or implied from the type of relationship between the defendant and the alleged agent.* Claims by one to possess authority to receive process or actual acceptance of process by an alleged agent will not necessarily bind the defendant. There must be evidence the defendant intended to confer such authority.

300 S.C. 411, 414, 389 S.E.2d 297, 298 (Ct. App. 1990) (emphasis added).[31]

---

[31] Appellants reference authorities interpreting practice under the federal counterpart to Rule 45 for the proposition that service of a subpoena on a corporation's attorney is ineffective. However, we do not find these authorities persuasive because Fed. R. Civ. P. 45(b)(1) limits service of a subpoena to the named person only ("Serving a subpoena requires delivering a copy to the named person and, if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law"), while South Carolina's rule is more flexible, allowing

Further, "[e]xacting compliance with the rules is not required to effect service of process." *BB & T v. Taylor*, 369 S.C. 548, 552, 633 S.E.2d 501, 503 (2006). "Rather, [the court must] inquire whether the plaintiff has sufficiently complied with the rules such that the court has *personal jurisdiction of the defendant* and the defendant has *notice of the proceedings*." *Roche v. Young Bros., Inc. of Florence*, 318 S.C. 207, 210, 456 S.E.2d 897, 899 (1995) (emphases added). "The principal object of service of process is to give notice to the defendant corporation of the proceedings against it." *Mull v. Ridgeland Realty, LLC*, 387 S.C. 479, 485, 693 S.E.2d 27, 30 (Ct. App. 2010) (quoting *Burris Chemical, Inc. v. Daniel Const. Co.*, 251 S.C. 483, 487, 163 S.E.2d 618, 620 (1968)).

Based on the foregoing, the circumstances in the present case allow the authority of Appellants' Charleston counsel to be implied from counsel's representation of them in the very litigation for which the subpoena was issued. *See Hamilton*, 300 S.C. at 414, 389 S.E.2d at 298 ("The courts must look to the circumstances surrounding the relationship and find authority which is either express or implied from the type of relationship between the defendant and the alleged agent."). Significantly, the circuit court already had personal jurisdiction over Appellants, and their counsel already had a duty to ensure they had notice of the proceedings. *See Taylor*, 369 S.C. at 552, 633 S.E.2d at 503 ("Exacting compliance with the rules is not required to effect service of process. 'Rather, [the court must] inquire whether the plaintiff has sufficiently complied with the rules such that the court has *personal jurisdiction of the defendant* and the defendant has *notice of the proceedings*.'" (alteration in original) (emphases added) (citation omitted) (quoting *Roche*, 318 S.C. at 210, 456 S.E.2d at 899)). Under these circumstances, counsel was authorized by Appellants to accept service of process under either Rule 4(d)(3) (personal service on a corporation) or (d)(9) (commercial delivery service).

Based on the foregoing, the circuit court properly denied Appellants' motion to quash the subpoenas.

## CONCLUSION

Accordingly, we affirm the circuit court's orders denying Appellants' motion to quash, denying their JNOV motion, granting Respondents' motion for new trial *nisi additur*, and granting in part Appellants' motion for set-off.

---

service on those persons designated in Rule 4(d) (named person or authorized agent or officer of corporation) or Rule 4(j) (named person or counsel).

**AFFIRMED.**

**WILLIAMS and MCDONALD, JJ., concur.**